1  KAMALA D. HARRIS
   Attorney General of California
2  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
3  CHRISTOPHER J. WEI
   Deputy Attorney General
4  State Bar No. 78958
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA  94102-7004
    Telephone:  (415) 703-5867
6   Fax:  (415) 703-1234
    E-mail:  Christopher.Wei@doj.ca.gov
7  *Attorneys for Respondent*

8

               IN THE UNITED STATES DISTRICT COURT
9
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                       SAN JOSE DIVISION
11

12

13  **ALFONZO A. PHILLIPS,**                C 11-04707 EJD (PR)

14                          Petitioner,

15            v.                           **MEMORANDUM OF POINTS AND**
                                           **AUTHORITIES**
16
    **CONNIE GIPSON, Warden,**
17
                          Respondent.
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Statement of the Case ............................................................................................... 1

Statement of Facts .................................................................................................... 1

Argument .................................................................................................................. 8

    I.     The state court reasonably excluded evidence of third party culpability ............... 8

    II.    The state court reasonably denied petitioner's motion to exclude the identification of petitioner by Daryl Flood ............................................ 14

         A.     Flood's preliminary examination testimony ............................................. 14

         B.     The motion to exclude the identification .................................................. 15

    III.   The state court reasonably excluded the defense videotape reenactment of the shooting ............................................................................................ 21

    IV.   The state court reasonably refused to grant petitioner permission to reopen his case and recall Dwight Johnson ......................................................... 25

         A.     Dwyane Johnson's testimony trial ........................................................... 25

         B.     Petitioner's motion to recall Dwayne Johnson ......................................... 26

    V.     The state court reasonably denied petitioner's request to reopen the case based on a San Francisco Chronicle article ............................................. 31

    VI.   The prosecution did not commit misconduct ..................................................... 34

    VII.  There was no prejudicial error ......................................................................... 42

Conclusion ............................................................................................................... 42

# TABLE OF AUTHORITIES

**Page**

CASES

*Alcala v. Woodford*
   334 F.3d 862 (9th Cir. 2003)..................................................................................... 12

*Bonin v. Calderon*
   59 F.3d 815 (9th Cir. 1995)....................................................................................... 35

*Boyde v. Brown*
   404 F.3d 1159 (9th Cir. 2005)................................................................................... 42

*Boyde v. California*
   494 U.S. 370 (1990) .................................................................................................. 40

*Brecht v. Abrahamson*
   507 U.S. 619 (1993) ........................................................................................... passim

*Brown v. Payton*
   544 U.S. 133 (2005) .................................................................................................. 37

*Carriger v. Lewis*
   971 F.2d 329 (9th Cir. 1992)..................................................................................... 29

*Chambers v. Mississippi*
   410 U.S. 284 (1973) ..................................................................................... 11, 12, 23

*Coleman v. Thompson*
   501 U.S. 722 (1991) .................................................................................................. 35

*Crane v. Kentucky*
   476 U.S. 683 (1986) .................................................................................................. 11

*Darden v. Wainwright*
   477 U.S. 168 (1986) ..................................................................................... 36, 40, 41

*Estelle v. McGuire*
   502 U.S. 62 (1991) ............................................................................................. 11, 23

*Fairbank v. Ayers*
   650 F.3d 1243 (9th Cir. 2011)................................................................................... 35

*Featherstone v. Estelle*
   948 F.2d 1497 (9th Cir. 1991)................................................................................... 35

*Fuller v. Roe*
   182 F.3d 699 (9th Cir. 1999) revd on other grounds ............................................... 42

ii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hayes v. Ayers*
   632 F.3d 500 (9th Cir. 2011)..........................................................................42

*Holmes v. South Carolina*
   547 U.S. 319 (2006) ..............................................................................11, 12

*Jackson v. Giurbino*
   364 F.3d 1002 (9th Cir. 2004)..........................................................................35

*Johnson v. Sublett*
   63 F.3d 926 (9th Cir. 1995)..............................................................................42

*Khaalid v. Bowersox*
   259 F.3d 975 (8th Cir. 2001) .....................................................................28, 29

*Manson v. Braithwaite*
   432 U.S. 98 (1977) ..................................................................................18, 19

*Marshall v. Lonberger*
   459 U.S. 422 (1983) ........................................................................................11

*Menendez v. Terhune*
   422 F.3d 1012 (9th Cir. 2005)..........................................................................41

*Michigan v. Lucas*
   500 U.S. 145.............................................................................................28, 29

*Montana v. Egelhoff*
   518 U.S. 37 (1996) .............................................................11, 23, 28, 33

*Neil v. Biggers*
   409 U.S. 188 (1972) ........................................................................................18

*Ortiz-Sandoval v. Gomez*
   81 F.3d 891 (9th Cir. 1996)..............................................................................40

*Parker v. Matthews*
   ___ U.S. ___, 132 S.Ct. 2148 (June 11, 2012) (per curiam)............................36, 40

*People v. Bonin*
   47 Cal.3d 808 (1989) .......................................................................................24

*People v. Bradford*
   15 Cal.4th 1229, 1326 (1997) ..........................................................................23

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Breckenridge*
52 Cal.App.3d 913 (1975)........................................................................... 20, 37

*People v. Carter*
48 Cal.2d 737 (1975) .................................................................................. 30

*People v. Cooks*
141 Cal.App.3d 224 (1983)......................................................................... 29, 33

*People v. Frohner*
65 Cal.App.3d 94 (1976).............................................................................. 30

*People v. Green*
27 Cal.3d 1 (1980) ...................................................................................... 30

*People v. Hall*
41 Cal.3d 826 (1986) .................................................................................. 12

*People v. Jones*
30 Cal.4th 1084 (2003) ............................................................................... 29

*People v. Lewis*
26 Cal.4th 334 (2001) ................................................................................. 13

*People v. London*
274 Cal.App.2d 241 (1969) ......................................................................... 37

*People v. Manson*
71 Cal.App.3d 1 (1977)............................................................................... 24

*People v. Newton*
8 Cal.App.3d 359 (1970).............................................................................. 30

*People v. Rist*
16 Cal.3d 211 (1976) .................................................................................. 20

*People v. Rodrigues*
8 Cal.4th 1060 (1994) ................................................................................. 20

*People v. Rodriguez*
152 Cal.App.3d 289 (1984).......................................................................... 30

*People v. Terry*
38 Cal.App.3d 432 (1974)............................................................................ 24

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Perry v. New Hampshire*

4

   \_\_\_U.S. \_\_\_, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012) ..................................................... 18, 19

*Perry v. Rushen*

5

   713 F.2d 1447 (9th Cir. 1983).................................................................................. 12, 13, 29

6

*Rich v. Calderon*

7

   187 F.3d 1064 (9th Cir. 1999)............................................................................................ 35

8

*Rupe v. Wood*

   93 F.3d 1434 ......................................................................................................................... 42

9

*Simmons v. United States*

10

   390 U.S. 377 (1968) .............................................................................................................. 18

11

*Slack v. McDaniel*

12

   529 U.S. 472 (2002) .............................................................................................................. 42

13

*Smith v. Phillips*

   455 U.S. 209 (1982).............................................................................................................. 36

14

*Spivey v. Rocha*

15

   194 F.3d 971 (9th Cir. 1999)............................................................................................... 13

16

*Stovall v. Denno*

17

   388 U.S. 293 (1967) .............................................................................................................. 18

18

*Taylor v. Illinois*

   484 U.S. 400 (1988)................................................................................... 11, 23, 28, 33

19

*United States v. Domina*

20

   784 F.2d ................................................................................................................................. 37

21

*United States v. Garcia-Guizar*

22

   160 F.3d 511 (9th Cir. 1998)............................................................................................... 41

23

*United States v. Gomez*

   846 F.2d 557 (9th Cir. 1988.)............................................................................................. 29

24

*United States v. Jackson*

25

   84 F.3d 1154 (9th Cir. 1996)............................................................................................... 41

26

*United States v. Lopez-Alveraz*

27

   970 F.3d 583 (9th Cir. 1992)............................................................................................... 41

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Necoechea*
   986 F.3d 1273 (9th Cir. 1993)...........................................................................41

*United States v. Robinson*
   485 U.S. 25 (1988)...........................................................................................41

*United States v. Scheffer*
   523 U.S. 303 (1998).................................................................11, 23, 28, 33

*United States v. Young*
   470 U.S. 1 (1985).............................................................................................41

*Wainwright v. Sykes*
   433 U.S. 72 (1977)...........................................................................................35

*Washington v. Texas*
   388 U.S. 14 (1967)...........................................................................................12

*Ylst v. Nunnemaker*
   501 U.S. 797 (1991).........................................................................................35

STATUTES

California Evidence Code
   § 353.................................................................................................................35
   § 403...........................................................................................................23, 24
   § 778.................................................................................................................29

California Penal Code
   § 187(a)..............................................................................................................1
   § 190.2(a)(17)(L)................................................................................................1
   § 215(a)..............................................................................................................1
   § 12021(a)(1)......................................................................................................1
   § 12022.7(a)........................................................................................................1
   § 12022.53(d)......................................................................................................1

Title 28 United States Code § 2254 .......................................................................11

CONSTITUTIONAL PROVISIONS

United States Constitution Sixth Amendment ...............................................29, 33

1

2                              **STATEMENT OF THE CASE**

3         Following a jury trial, petitioner Alfonza Phillips was found guilty of first degree murder

4    (Cal. Penal Code § 187(a)[1]), attempted carjacking (§ 215(a)), and possession of a firearm by a

5    felon (§ 12021(a)(1)), as well as a finding that petitioner personally used a firearm (§§

6    12022.7(a), 12022.53(d)), and the special circumstance finding that the murder was committed

7    during the commission of a carjacking (§ 190.2(a)(17)(L)).  Petitioner was sentenced, on

8    December 14, 2007, to life imprisonment without possibility of parole.  Exh. 1, 2CT 480-482,

9    531-533, 538-542.

10        Petitioner appealed his conviction and on April 29, 2010, the California Court of Appeal for

11   the First Appellate District affirmed petitioner's conviction in its entirety.  Exh. 2.  The California

12   Supreme Court denied petition for review on August 18, 2010.  Exh. 6.

13                             **STATEMENT OF FACTS**

14        Dung Nguyen works for his uncle at the 76 gas station on Martin Luther King Junior Way.

15   5RT 954.  Dung was working on October 25, 2005 and remembered seeing a black BMW sedan

16   come into the station.  5RT 955.  The owner of the BMW (Antar Bey) regularly filled up at the

17   station.  5RT 955.  The owner, a black male wearing a white T-shirt and a baseball hat, came into

18   the station to pay for the gas before walking back outside.  5RT 957-958.  Soon thereafter, Dung

19   heard a loud bang and saw a flash.  5RT 959.  Dung immediately shut off all the gas pumps and

20   looked out the window to see people scattering in all directions.  5RT 959.  Dung saw a black

21   male hop inside the driver's side of the BMW.  5RT 960, 962.  This was not the owner of the

22   BMW.  5RT 961.  He was in his late teens, 5'5" to 5'8" and about 130 to 150 pounds.  5RT 961.

23   He wore black clothing.  5RT 961, 979.  The man stayed in the car for a few seconds before

24   quickly getting out and running off towards 55th Street.  5RT 960, 962-963.

25        Dung ran outside to see what was going on and found the owner of the BMW lying face

26   down on the ground with a gunshot wound.  5RT 964-965.  After calling 911, Dung approached

27   _____

         [1] Unless otherwise specified, all further section references are to the California Penal

28   Code.

                                      1

1   the victim, who was gasping for air.  5RT 974.  Dung grabbed the man's hand and tried to

2   reassure him, telling him that everything was going to be okay.  5RT 974.  Bey was not moving

3   but Dung held onto his hand until the paramedics arrived.  5RT 975.

4        Meanwhile, Daryl Flood, the owner of a commercial janitorial service was on his way to a

5   job with two workers in his van when he stopped at a traffic light at 55th Street and Martin Luther

6   King Junior Way.  6RT 1021-1025.  He noticed an attractive black BMW at the 76 gas station.

7   6RT 1027.  Floyd remembered seeing both the BMW and the driver on prior occasions.  6RT

8   1046.  Two men stood at the rear of the car.  One was pointing a gun at the other.  6RT 1027.

9   Flood turned to tell his co-workers when he turned around and saw the gun go off.  6RT 1027.

10  The other man stumbled and fell to the ground.  6RT 1027.  The assailant ran over to the BMW,

11  opened the driver's side door and jumped in.  6RT 1027.  Flood saw a lot of movement inside the

12  BMW before the man exited the car and fled.  6RT 1028.  He described the man was a young

13  black male, 5'5" to 5'8", wearing dark clothing.  6RT 1029.[2]

14       It appeared to Flood that the man who fired the shot was running toward his van.  6RT 1028.

15  Flood therefore put his van into reverse to back up and get away.  6RT 1028-1029.  The assailant

16  instead headed toward 55th Street and Market.  6RT 1029.  Flood pulled up into the gas station

17  and attended to the victim, who was lying face-down on the ground.  6RT 1029-1030.  The victim

18  wore a white T-shirt, jeans, and a baseball cap.  6RT 1030.  The victim's eyes were open and

19  Flood told him not to worry and that help was on the way.  6RT 1034.

20       When Flood first saw the victim, the man had a cell phone and key in his hand.  6RT 1031.

21  He was talking on the phone.  6RT 1031.  By the time Flood got to the victim, the key and phone

22  were on the ground near the victim.  6RT 1032-1033.

23       Flood identified petitioner at trial.  6RT 1029-1030.  He never told the police that he would

24  never be able to identify the suspect in the case.  6RT 1038-1039.  Floyd first saw petitioner after

25  the shooting at petitioner's preliminary hearing.  6RT 1041.  He recognized petitioner as the

26  suspect in the case.  6RT 1041.  Floyd also testified and identified petitioner as the shooter at the

27  _____

28       [2] Petitioner is a young black male, 5'7" in height, and weighs 145 pounds.  6RT 1127.

1    preliminary hearing. 6RT 1041. He recognized petitioner's face. 6RT 1055. Floyd's

2    identification of petitioner had nothing to do with seeing petitioner in jail clothing at the

3    preliminary hearing. 6RT 1086. Floyd was positive of his identification of petitioner as the

4    assailant. 6RT 1087-1088. "Well, I'm not trying to pin anything on this young man. I know that

5    that's the guy that I saw that night, and I'm here to testify." 6RT 1088.

6          Toan Nguyen owns the 76 gas station at 5425 Martin Luther King Junior Way. 5RT 906.

7    On approximately 7:30 p.m. on October 25, 2005, Toan received a telephone call to return to the

8    gas station because someone had been shot at the station. 5RT 907. When he arrived at the

9    station, he noticed a black BMW parked at one of the pumps. 5RT 908. Toan recognized it as

10   the car belonging to a customer who regularly filled up at the station. 5RT 908. The station had

11   installed surveillance cameras earlier. 5RT 909. Toan viewed footage from the surveillance

12   cameras with police officers after the shooting. 5RT 911. The video was shown to the jury and it

13   showed, among other things, someone running across the gas station parking lot at 7:41 p.m.

14   5RT 919-923.

15         At approximately 7:35 p.m. on October 25, 2005, Officer Jose Vasquez was on patrol when

16   he received a dispatch about a shooting at 5425 Martin Luther King Junior Way in Oakland. 2RT

17   392. When Vasquez responded to the 76 gas station at Martin Luther King Junior Way and 55th

18   Street, the paramedics were already at the scene administering aid to the victim. 2RT 393. Antar

19   Bey was laying face down with a gunshot wound to his back. 2RT 394. Vasquez also found a

20   cell phone and car key on the ground near Bey's body. 2RT 397-398; 3RT 467-468. The car key

21   belonged to a black 2005 745 BMW parked at the gas pump. 2RT 398; 3RT 470; 6RT 1116-1117.

22   The BMW had personalized license plates, "Dr. Bey." 2RT 413. The gas hose was still attached

23   to the BMW. 2RT 398. The car also had 22-inch rims and was in good, clean condition. 2RT

24   413-414. The police also found some money in Bey's pocket. 3RT 472.

25         Vasquez subsequently viewed a surveillance video inside the 76 gas station. 2RT 400.

26   From the surveillance video, Vasquez could see that the suspect fled on foot in a westbound

27   direction toward 55th Street. 2RT 402. Vasquez also unsuccessfully searched for shell casings at

28   the scene. 2RT 401.

1       Forty-four-year-old Dwayne Johnson lives with his wife Patricia Franklin and her children,

2   which included 24 year-old Althea Foy.  4RT 729.  Johnson has an extensive criminal history,

3   including convictions for robbery, burglary, and grand theft.  4RT 730.  He is also a heroin and

4   crack cocaine addict.  4RT 731.  Johnson is an informant for the Oakland Police Department and

5   regularly talks to Officer Marcus Midyett, whom he has known for five or six years.  4RT 735.

6   He has provided information to Officer Midyett on numerous occasions.  4RT 736.

7       On October 25, Johnson contacted Midyett and told him that he had information on the

8   murder of Antar Bey.  4RT 736.  Petitioner had admitted to Johnson that he killed Bey.  4RT 736-

9   737.  Johnson decided to inform the police of what petitioner had said because this was the

10  murder of an innocent individual and Johnson had seen the victim on several occasions preach on

11  television.  4RT 738, 743.  Bey was well known in the community and was associated with the

12  Black Muslim Bakery.  4RT 743.  Johnson has seen Bey driving around in his black BMW with

13  expensive 22-inch rims.  4RT 744.

14      Petitioner was his stepdaughter Althea Foy's boyfriend and would come over and spend

15  almost every night with Althea at the house.  4RT 739.  While Johnson and petitioner got along

16  well at the beginning, they got into a fight over money from selling drugs.  4RT 740-741.

17      Johnson first learned of Bey's murder from David Evans, a member of the Looney Tunes

18  gang.  4RT 744-745.  Petitioner hung out with the gang and was a good friend of Evans.  4RT 745.

19  Petitioner bragged that he committed the murder of Bey and admitted to Johnson that he killed

20  him.  4RT 745-747.  Petitioner said he killed Bey because he wanted the 22-inch rims on the

21  BMW.  4RT 747.  He wanted to impress Althea and give her the rims.  4RT 747.  Petitioner did

22  not have a car but Althea had once stated that she wanted 22-inch rims for her Pontiac Bonneville.

23  4RT 747.  Petitioner said he shot Bey with a .44 magnum revolver.  4RT 753.  Althea also told

24  Johnson and his wife that petitioner had murdered Bey.  4RT 749.  Petitioner was nonchalant and

25  boastful of the killing.  4RT 799.  Althea said that it was a carjacking gone bad and that he had

26  committed the crime to try to get the rims.  4RT 750, 752.  Althea discussed petitioner's

27  involvement in the murder on two or three occasions.  4RT 751.  Althea said that petitioner shot

28  the victim in the back and panicked.  4RT 753.  During the period when petitioner stayed in

4

1   Johnson's home with Althea, Johnson saw petitioner on four or five occasions with a .44 magnum

2   revolver.  4RT 752.

3        After discovering that petitioner was involved in the murder, Johnson saw petitioner in the

4   house with Althea a couple of times.  4RT 758.  Johnson believed that his life, as well as the lives

5   of the rest of the family, were in danger because petitioner had killed a Black Muslim.  4RT 759-

6   760.  He feared that the Muslims would extract revenge for the killing.  4RT 760.  That was one

7   of the reasons for contacting the police with information.  4RT 760.  As a result of providing

8   information to the police, Johnson received $1,000 from "Crime Stoppers."  4RT 760.

9        Johnson testified that petitioner was shot in the leg about a week or two before the murder

10  of Bey.  4RT 760.  However, the injury did not require petitioner to use crutches nor did it

11  prevent him from walking around by the time of the murder.  4RT 761.

12       Johnson was shown a group of photographs in one interview with the police and he

13  identified a picture of petitioner as the person who admitted shooting Bey.  4RT 762-764.  He

14  also drew a picture of the gun for the detectives.  4RT 764.  Johnson had also seen petitioner in a

15  dreadlock wig.  4RT 766.  Petitioner began wearing the wig after the shooting.  4RT 766.

16       About a month after first providing information to the police, Johnson came into the station

17  and turned in some .44 caliber magnum bullets that he found in the petitioner's pockets.  4RT

18  802-803; 6RT 1128.

19       Officer Marcus Midyett confirmed that Dwayne "Decon" Johnson had worked as an

20  informant for him for seven or eight years.  5RT 825.  Johnson provided the officer with

21  information on cases.  5RT 825.  In October, 2005, Johnson called Midyett to tell him that he had

22  information regarding the Bey murder.  5RT 827.  As a result of the information provided by

23  Johnson, Midyett actively looked for petitioner.  5RT 828.  A warrant was issued for petitioner's

24  arrest on November 2, 2005.  5RT 829.

25       Sergeant Derwin Longmire of the Oakland Police Department's homicide division was

26  assigned with Sergeant Nolan to the homicide of Antar Bey at 5425 Martin Luther King Way.

27  2RT 296.  On October 28, 2005, Longmire conducted an interview with Dwayne Johnson.  2RT

28

5

297.  Johnson had been an informant for the police.  Johnson provided the police with a

photograph of petitioner and indicated that this was the person who shot Antar Bey.  2RT 305.

In the autopsy of Antar Bey, it was found that in addition to a few abrasions and contusions,

he suffered a gunshot wound on the right side of his back.  2RT 363.  The bullet passed through

Bey's liver, heart, and sternum before coming to rest in some soft tissue adjacent to the sternum.

2RT 368.  There was a significant amount of blood in the cavities of petitioner's body.  2RT 372.

The police recovered fingerprint from Bey's BMW.  3RT 473-475.  The print recovered

from the vehicle matched petitioner's left middle finger.  3RT 585.  The criminalist who made the

comparison was 100 percent confident of this conclusion.  3RT 586.

A criminalist examined the bullet recovered from Antar Bey's body and concluded that it

was a .44 caliber hollow point bullet.  5RT 864, 869.  The bullet could have come from either a

Smith and Wesson, Model 29 .44 magnum revolver or a Taurus .44 special caliber revolver.  5RT

874.

The surveillance video indicated that this was a street robbery.  6RT 1119.  Dwayne

Johnson's statement on September 28, 2005 provided the police with information pointing to

petitioner.  6RT 1120.  To confirm Johnson's statement, Nolan had the criminalist type and class

the slug recovered from Antar Bey's body.  6RT 1122.  This confirmed the information provided

by Johnson.  6RT 1123.  The police also compared a fingerprint found on the victim's car to

petitioner's prints.  6RT 1124.

On November 4, 2005, Midyett stopped Althea Foy's car and talked to her about petitioner.

5RT 828.  Midyett had information that Foy was driving around with petitioner.  5RT 837.  Foy

was hostile toward the officer and said she did not know where petitioner was.  5RT 833.

Midyett warned Foy that if she was caught harboring petitioner, she would be arrested and taken

into custody.  5RT 833.  Foy refused to provide any information to the officer and drove away.

5RT 834.

On November 8, 2005, Officers Jason Andersen and Marcus Midyett were driving their

patrol car when they noticed Althea Foy driving in her Pontiac Bonneville in West Oakland.  6RT

1207.  The two other passengers inside the car were sitting low in their seats.  6RT 1208.  The

6

officers conducted a felony stop of the vehicle.  5RT 840.  When Midyett ordered Foy out of the

vehicle, she approached the officer and said to him, "He's in the car."  5RT 841-842.  Foy also

subsequently said to Midyett, "I was going to call you."  5RT 842.  The officers ordered the two

passengers out of the vehicle.  6RT 1208-1209.  Petitioner was in the front passenger seat.  He

wore a dreadlock wig.  6RT 1210.  Vidal Hughley was in the rear passenger seat.  They were

taken to the police station where Longmire and Nolan interviewed them separately.  2RT 300,

310; 5RT 842-843.  Foy was allowed to go to the bathroom and was given a police department

jacket to wear.  2RT 311.  She was not handcuffed.  2RT 313.  Longmire denied ever telling Foy

that the Black Muslims would come after her if she did not cooperate.  2RT 315.  He never

threatened to slap her.  2RT 316.  Instead, Longmire tried to build some rapport with her.  2RT

316.  Foy did not appear to be intimidated or scared of either Longmire or Nolan.  2RT 317.

During this interview, Foy said she knew that petitioner committed the murder of Antar

Bey.  ACT 2.[3]  Petitioner told Foy that he killed Bey in a carjacking gone bad.  ACT 3.  She had

heard rumors about his involvement in the killing from the Looney Tunes gang, who warned her

about being around petitioner because the Muslims and the police were looking for him.  2RT 3.

Toni Sall, an inspector for the district attorney's office, first met Althea Foy when he and

the deputy district attorney went to Foy's residence.  4RT 700.  Foy's mother, Patricia Franklin

met the pair at the door to the residence and began yelling at Sall.  She was angry and belligerent

that the prosecution wanted Foy to come and testify in court.  4RT 701.  She told Sall that Foy

was not at the house but Sall noticed Foy walking down the hallway of the residence and yelled

out to her.  4RT 701.  Foy also yelled at the inspector and had a hostile and belligerent attitude.

4RT 702.  Sall informed Foy that she was there to serve her with a subpoena to appear as a

witness in the case against petitioner but Foy began flailing her arms around, screaming and

yelling.  She was extremely angry.  4RT 702-703.  Foy grabbed the subpoena from the kitchen

table and ripped it up.  4RT 704-705.  She walked up to within inches of Inspector Sall and yelled

at the inspector.  4RT 705.

---

[3] "ACT" refers to the Augmented Clerk's Transcript on Appeal that includes People's
Exhibit 26A, the interview of Althea Foy.

7

1   Sall left the subpoena with Foy and explained that she needed to be in court on September

2   26, 2007.  4RT 706.  Foy failed to show up on that date and Sall monitored her work status at the

3   post office. 4RT 706.  On October 4, 2007, Sall learned from the postal police that Foy had

4   shown up at work and the inspector went to the post office to arrest her for failure to appear.  4RT

5   707, 709.  Foy was angry about the arrest and was angry when Sall explained why she had to

6   testify in the case.  4RT 709-710.  She said, "I'm not going to testify."  4RT 710.  During this

7   time, Foy's family members had gathered outside the post office and were yelling and taunting

8   the inspector.  4RT 711.

9   Sall also testified that the authorities made considerable efforts to locate Vidal Hughley to

10   testify in court.  4RT 712-715.  However, they have not been successful in finding Hughley.  4RT

11   715.

12   Foy continued to stay in contact with petitioner following his arrest, visiting and talking to

13   him on the telephone.  2RT 250-25-2.  She also gave him money while he was in jail.  1RT 258.

14   **ARGUMENT**

15   I.   **THE STATE COURT REASONABLY EXCLUDED EVIDENCE OF THIRD PARTY CULPABILITY**

16

17   Prior to trial, the prosecution moved to exclude evidence relating to third party culpability.

18   2CT 287.  Petitioner moved to admit third party culpability evidence.  2CT 321.  According to

19   petitioner, there was a war within the Black Muslim organization for control of the Black Muslim

20   Bakery and that this provided the motive for the killing of Antar Bey.  CT 325, 327.

21   > The evidence to be presented would show that John Bey told the Oakland Police
22   > Department shortly after Waajeed Aljawwaad's killing that he thought Antar Bey was
23   > responsible for the killing.  In June of 2005, John Bey was shotgunned in front of his
24   > home and escaped with his life.  Oakland Police Department has publicly stated that
25   > they believe the John Bey attempted murder was a Black Muslim hit.  John Bey
26   > moved out of the Oakland area out of fear for his life.  The proffered evidence from
27   > Joshaya Joshua would show that Antar Bey's violent Muslim enemies tried to kill
28   > him twice within a month of his killing that he received death threats shortly before
29   > his killing and that there was a power struggle within the Black Muslim organization
30   > for control of the bakery.  All of the evidence of third party culpability is offered to
31   > rebut the carjacking allegations not to portray Antar Bey as a violent thug and
32   > murderer.

28   2CT 325.

8

1   Petitioner's theory was that this was a power struggle and a Black Muslim hit on another

2   Black Muslim, not a carjacking.  1RT 77.  The district attorney argued that any such evidence

3   was irrelevant unless the defense could show some link between the alleged power struggle and

4   the homicide.  1RT 77.  Petitioner could not  even identify a third party culprit.  2CT 293.  "There

5   is no admissible direct or circumstantial evidence that supports the notion that Yusef Bey IV or

6   some other member of Your Black Muslim Bakery killed Antar Bey to gain control of the

7   bakery."  2CT 293.

8   Upon questioning by the trial court, counsel for petitioner admitted that John Bey's

9   statement to the police that he thought Antar Bey was responsible for the murder of Waajeed

10  Aljawwaad was hearsay and just an expression of his opinion.  There was no evidence to support

11  that proposition.  1RT 152.  There was no evidence of who was responsible for the June 2005

12  shooting of John Bey.  1RT 153.  Joshaya Joshua was only home on the first occasion when

13  someone tried to shoot him.  1RT 156.  Evidence that Antar Bey had "violent Muslim enemies"

14  and received death threats shortly before his killing came from the notes of Sergeant Nolan.  1RT

15  156-157.

16  The court granted petitioner's request to delay ruling on the motion until petitioner received

17  information about whether any .44 magnum firearm was ever recovered in searches of any Black

18  Muslim property.  1RT 77-78.  The district attorney reported back that no .44 magnum was ever

19  recovered in connection with any search relating to Black Muslim property.  1RT 84.  Counsel for

20  petitioner then requested the court to again reserve judgment on its decision so that counsel could

21  interview another witness in order to present other evidence to augment his motion.  1RT 90.

22  That interview did not produce any new evidence.  1RT 147-148.

23  The court ruled that this evidence was inadmissible.

24      Mr. Ulfelder made a comment last week, which sort of summarized the offer of
        proof, and that is that he felt the evidence would lead to the conclusion that the
25      People – this other faction that was trying to gain control of the bakery, "Your Black
        Muslim Bakery," had put a hit out on Mr. Bey.
26

27      I guess the bottom line is this:  even if that's true, how does that tend to show it
        wasn't the defendant?  That's a rhetorical question.  Why is it that that would
        necessarily mean that the defendant wasn't the person was making the hit? . . . [¶]
28      But the real purpose would be to try to give rise to an inference, or I think, and the

                                                9

D.A.'s argument is not only speculation, and I think the D.A.'s position is more on target – speculation that it wasn't the defendant, it was somebody from this "Your Black Muslim Bakery" faction, and I don't think there's any basis on which to argue that, other than coincidence that there was a power struggle going on.

And so I don't find that the element – first of all, much of the evidence is hearsay or opinion evidence, which wouldn't be admitted anyway, and when you take out all of that, it leaves very, very, very little.  It basically leaves – I think the fact that Ms. Joshua is able to testify that somebody fired or shot into their home once.  It sounds like her reference to another attempt is hearsay, and her description of who was responsible is hearsay and/or opinion.  So basically we're left with some other people got killed or shot at, and somebody shot at . . . the victim's home. . . . I don't think that makes this evidence relevant, so for that reason, the district attorney's motion to exclude the evidence that's been offered by Mr. Ulfelder, proffered by him, is granted, as we had discussed informally.

1RT 162-163.

Petitioner renewed his argument on direct appeal in state court.  The California Court of Appeal rejected petitioner's claim.

We agree with the trial court's conclusion that almost all of the proffered evidence was inadmissible hearsay or opinion. [Citation.]  Defendant made no offer of proof that John Bey would testify either to having been shot at in front of his house or to the basis of his alleged statements to the police department that he believed Bey was responsible for Aljawwaad's killing.  Defendant did not indicate he intended to call any witness associated with the Bey family other than Joshua.  Nothing in Joshua's alleged statements to Nolan and Longmire, as clarified by defense counsel, indicated that she personally had heard any threats against Bey or that she had heard any member of the Bey family say they wanted to control the bakery.  The only nonhearsay testimony it appears she would have given is the evidence that one or more shots were fired at their home while she was present.  [Footnote omitted.]

Defendant contends that some of the evidence, including John Bey's alleged statement to the police, was admissible for the nonhearsay purpose of showing the declarant's state of mind: i.e., it showed that members of a rival Black Muslim faction intended to assassinate Bey and then acted in conformity with that intent.  [Citation.]  We reject this contention.  Nothing in John Bey's alleged statement indicated he intended to seek revenge against Bey and, as we have discussed, there is no indication that Joshua herself heard the other statements at issue.

As we have explained, evidence of another person's motive or opportunity to commit a crime is not admissible to show third party culpability unless there is "'direct or circumstantial evidence *linking the third person to the actual perpetration of the crime.*'"  [Citation.]  Evidence that an unknown person had fired shots into Bey's home would not establish a third person had later actually killed him at the gas station, then got briefly into his car, before running away.  Nor would it provide a nonspeculative basis to conclude that defendant killed Bey on behalf of a rival faction connected with the bakery, rather than doing so in the course of a carjacking.  Defendant failed to make an adequate offer of proof that he possessed admissible evidence demonstrating either that he was not committing a carjacking when he killed Bey or that someone else was the killer.  [Citation.]  The trial court did not abuse its discretion in excluding proffered evidence.

10

1    Exh. 2, at 10-12.

2          The state court's opinion did not result in a decision that was contrary to, or involved an

3    unreasonable application of, clearly established federal law, as determined by the United States

4    Supreme Court, or resulted in a decision that was based on an unreasonable determination of the

5    facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §2254.

6          Federal habeas review does not lie to review a state court's evidentiary ruling, unless it was

7    so prejudicial as to constitute a violation of due process.  *Estelle v. McGuire,* 502 U.S. 62, 67

8    (1991).  "The Due Process Clause does not permit the federal courts to engage in a finely tuned

9    review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6

10   (1983).  Thus, "state and federal rulemakers have broad latitude under the Constitution to

11   establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S.

12   319, 324 (2006).

13         A defendant "does not have an unfettered right to offer testimony that is incompetent,

14   privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484

15   U.S. 400, 410 (1988).  The exclusion of even relevant evidence does not violate due process,

16   unless the state court's ruling offends a "fundamental principle of justice."  *Montana v. Egelhoff*,

17   518 U.S. 37, 42-43 (1996).  "A defendant's right to present relevant evidence is not unlimited, but

18   rather is subject to reasonable restrictions" as set forth in the state's evidentiary rules.  *United*

19   *States v. Scheffer*, 523 U.S. 303, 308 (1998).

20         A due process violation arises only where the excluded evidence had "persuasive

21   assurances of trustworthiness" and was "critical" to the defense.  *Chambers v. Mississippi*, 410

22   U.S. 284, 302 (1973).  In *Chambers*, the Supreme Court held that due process "is, in essence, the

23   right to a fair opportunity to defend against the State's accusations."  *Id.* at 294.  There, the

24   excluded evidence consisted of the hearsay testimony of three witnesses who had heard another

25   man confess to the charged crime.  *Id*. at 303.  The Supreme Court found a due process violation

26   because that evidence was both trustworthy and critical.  *Id*. at 302; *see Crane v. Kentucky*, 476

27   U.S. 683, 690-691 (1986) (error to exclude evidence that was "central to the defendant's claim of

28   innocence" and "indispensable" to defense).

                                                    11

In *Washington v. Texas*, 388 U.S. 14 (1967), the excluded evidence consisted of the testimony of co-defendant Fuller, who had already been convicted, who would have testified that the defendant fled before Fuller fired the fatal shot. *Id*. at 16.  The Supreme Court held that the state's rule excluding such evidence on the belief that accomplices would be inclined to lie in order to get each other acquitted was arbitrary and irrational, because it prevented the admission of evidence "even if it were the only testimony available on a crucial issue." *Id*. at 21.  Thus, the state's rule did not outweigh the defendant's right to compulsory process to present defense witnesses. *Id*. at 23.

*Chambers* and *Washington* "demonstrate the unusually compelling circumstances required to outweigh the strong state interest in administration of its trials." *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir. 1983).  Further, if a constitutional violation arose, it must be assessed for prejudice. *Alcala v. Woodford*, 334 F.3d 862, 879 (9th Cir. 2003).

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court held that the exclusion of evidence of third party liability denied due process where the state court's sole rationale for the ruling was that the prosecution's evidence was strong, and the court did not address the probative value of the proffered defense evidence. *Id.* at 329.  However, the Supreme Court reaffirmed the states' rights to fashion rules that exclude evidence where the probative value is outweighed by the potential to mislead, cause confusion, or create unfair prejudice. *Id*. at 326.  The Supreme Court expressly approved the states' rights to exclude third party culpability evidence under this standard. *Id.* at 328 (citing *People v. Hall*, 41 Cal.3d 826, 833 (1986), which states the California rule that to be admissible third party culpability evidence must be capable of raising a reasonable doubt, and court need not allow "any evidence, however remote," such as evidence of another person's mere motive or opportunity to commit the crime).

Thus in *Perry v. Rushen*, 713 F.2d 1447, 1451-1455 (9th Cir. 1983), the court decided that the exclusion of third-party culpability evidence did not violate the defendant's due process or the right of compulsory process.  It concluded that Perry's proffered evidence fell far short of the critical and reliable evidence considered in *Chambers*. It is also less weighty and central.  While Perry's evidence was not actually irrelevant, it was sufficiently collateral and lacking in probity

12

on the issue of identity that its exclusion did not violate the sixth and fourteenth amendments. "California may constitutionally require more cogent evidence than this before opening up collateral issues at trial." *Id.* at p. 1455.

In *Spivey v. Rocha,* 194 F.3d 971, 978 (9th Cir. 1999), the Ninth Circuit approved of the California standard adopted in *Hall*:

> In order for evidence of another suspect to be admissible, however, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." Motive or opportunity is not enough. In this case, Spivey had no evidence of another person's actual motive to murder Marcus. Instead, Spivey sought to introduce evidence of Marcus's gang affiliation to "raise an inference that an unknown party (such as [a] Blood gang rival) may have shot Marcus for gang related reasons." This evidence is purely speculative. It does not identify a possible suspect or link any third party to the murder, or establish an actual motive rather than a possible or potential motive. Hence, the trial court's ruling that the evidence of gang affiliation was inadmissible did not render Spivey's trial fundamentally unfair.

*Id.* at p. 978.

In the instant case, the trial court did not violate any constitutional rights when it excluded evidence that someone other than petitioner killed Antar Bey. The fact that there was allegedly a power struggle among Oakland's Black Muslims and that these Muslims had a motive to kill Bey is insufficient to justify the introduction of third party culpability evidence. There is no evidence linking anyone else to Bey's murder. The only proffered evidence implicating anyone else was of motive: The Black Muslims had a motive to kill Bey because of the power struggle. However, evidence of motive alone did not provide direct or circumstantial evidence linking a member of the Black Muslim group to Bey's murder. *See People v. Lewis*, 26 Cal.4th 334, 372 (2001). The proffered evidence was simply not relevant.

There was absolutely no evidence tying anyone to the murder other than petitioner. There was only speculation. Simply because a faction of the Black Muslims was in a power struggle and may have wanted to see Bey dead did not show that they killed Bey. As the court stated, "I don't think there's any basis on which to argue that, other than coincidence that there was a power struggle going on." 1RT 163.

Further, the trial court determined that the proffered evidence was largely inadmissible. John Bey's comment to the police that he thought Antar Bey was responsible for the killing of

13

Waajeed Aljawwaad is both hearsay and inadmissible opinion evidence. 1RT 152. Evidence that someone attempted to shoot John Bey in front of his home is irrelevant since there is no evidence connecting Antar Bey to that assault. 1RT 153-154. Petitioner's assertions that Joshaya Joshua said that Antar Bey's Muslim enemies tried to kill him and that Bey received death threats were "gleaned" from notes by police officers that defense counsel read. 1RT 156-158. Defense counsel agreed with the court that "[b]ut as of right now, you have nothing specifically, that tells me—you have nothing more to offer that indicates its—I'm sorry. Basically, as I understand it, you have no information that would show that it's anything more than a conclusion on her part, or hearsay that she's passing on, right?" 1RT 157-158.

The trial court correctly summarized petitioner's claim:

> At any rate, the People intended to offer specific evidence that the defendant committed this, basically what I see, and forgive me for—if you—I know you're not going to agree with this characterization, Mr. Ulfelder, and this is not directed at you in any way, but basically it's an effort to show that there were other things going on in the world that caused some other people perhaps to have a motive to kill Mr. Bey. But that doesn't necessarily link those facts—there's nothing that I see that links those facts with this, other than a coincidence, the fact that these things were going on, and I don't think coincidence is a basis for admitting evidence which otherwise has no link with this case.

1RT 161-162.

Therefore, the proffered third-party culpability evidence was not relevant, much less critical or trustworthy. The trial court's decision to exclude third-party culpability evidence and the state appellate court opinion upholding that decision were not contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

Nor was any error prejudicial under *Brecht v. Abrahamson,* 507 U.S. 619 (1993). The third-party culpability evidence was so speculative that even if it had been admitted, the verdict would have been the same, as the evidence of petitioner's guilt was strong.

## II. THE STATE COURT REASONABLY DENIED PETITIONER'S MOTION TO EXCLUDE THE IDENTIFICATION OF PETITIONER BY DARYL FLOOD

### A. Flood's Preliminary Examination Testimony

Daryl Flood testified at the preliminary examination that he witnessed the shooting of Antar Bey when his vehicle was stopped at a red light at the intersection of 55th Street and Martin

14

1   Luther King Boulevard.  1CT 21.  He saw two men at the 76 gas station.  The assailant with the

2   gun was facing Flood and he could see his entire face.  1RT 24 26-27.  Flood described the

3   assailant as a young Black male with dark complexion.  1CT 25.  He wore dark clothing and a cap

4   or a hoodie.  1CT 25.  The man was about 5'7" to 5'8" tall.  1CT 25.  Flood also described the

5   victim of the shooting.  1CT 26.  Flood looked directly at the two men and did not take his eyes

6   off the scene.  1CT 29.  After the assailant shot the victim, Flood watched as the assailant ran up

7   to the BMW, opened the driver's door and got inside.  1CT 30-31.  About a minute later, the

8   assailant got out and ran off.  1CT 31.  Flood recalled seeing the gunman as he left the BMW.

9   1CT 33.

10   Flood identified petitioner in court as the gunman.  1CT 34.  He recognized petitioner from

11   seeing him at the gas station.  1CT 34.  He got a good enough look at the assailant.  1CT 34.  "I

12   looked at him just like I'm looking at you."  1CT 34.  Flood was 90 percent sure of his

13   identification.  1CT 35.  The 10 percent he was unsure about was because Flood could not see the

14   assailant's hair during the shooting.  1CT 36.  His head was covered.  1CT 36.

15   Petitioner conducted a very thorough cross-examination of Flood's testimony concerning

16   his identification of petitioner.  1CT 35-99.

17   **B.     The Motion to Exclude the Identification**

18   Petitioner moved to exclude Flood's in-court identification of him.  2 CT 315.  At the

19   hearing on the motion, Deputy District Attorney Greg Dolge testified that he was assigned to

20   petitioner's preliminary examination.  1RT 99.  Dolge did not discuss any of the facts of the

21   offense with Flood prior to the first day of the preliminary examination, on September 13, 2006.

22   1RT 100-101.  Immediately before going into court, Dolge talked with Flood but did not ask him

23   if he felt he would be able to identify the shooter in the case.  1RT 101.  He did not think about it

24   because Flood was called to testify about the specific facts of the event.  1RT 101-102.  Dolge did

25   not have any discussion about identifying the assailant.  1RT 103-104.  He may have informed

26   Flood, "I may ask you if you recognize anybody in court."  1RT 102.

27   At some point during that first day of the preliminary examination, Flood entered the

28   courtroom in order for the judge to order him to return for the second day of the preliminary

1   hearing.  1RT 104.  Flood was in the courtroom when petitioner was taken from his holding cell

2   to the defense table, dressed in his jail uniform and shackled hand and foot.  1RT 105.

3          On the second day of the preliminary hearing, September 18, 2006, Flood was again in the

4   courtroom when petitioner was brought into the courtroom dressed in his county jail outfit and

5   shackled.  1RT 107-108.

6          Defense counsel did not request that Flood be shown a physical or photo lineup prior to the

7   preliminary hearing.  1RT 110.  They did not ask that Flood not be brought into the courtroom

8   until he was ready to testify nor did they request the court to shield petitioner from Flood during

9   his testimony.  1RT 115-116.  On September 13, 2006, Flood was in the courtroom with

10  petitioner for less than 15 minutes.  1RT 110-112.  On that date, Dolge never indicated to Flood,

11  either verbally or via a physical sign, that the defendant was coming out of his holding cell.  1RT

12  112.  Dolge had no discussions with Flood on that first day of the preliminary examination

13  regarding whether Flood would be able to identify the shooter.  1RT 113.

14         Dolge did not have any further discussions with Flood between September 13 and

15  September 18, 2006.  1RT 113.  Flood never indicated that he recognized petitioner as the shooter.

16  1RT 113-114.  In fact, Dolge was surprised when Flood positively identified petitioner as the

17  shooter.  1RT 114.

18         There was no indication that Flood would identify petitioner.  The police had not shown

19  Flood a photo lineup and did not have him attend a physical lineup.  1RT 115.  Dolge did not

20  have any conversation with law enforcement where they revealed that they believed Flood was

21  not capable of making an identification.  1RT 120.  Rather, it appeared that the police believed

22  that they were able to identify petitioner from the fingerprint found on the car and from the

23  admissions by petitioner to other witnesses.  1RT 120.  The preliminary examination occurred 11

24  months after the shooting and Dolge did not think that Flood was a witness who would identify

25  petitioner.  However, as the direct examination went on, Dolge got the sense that perhaps Flood

26  could identify petitioner and he decided to just ask him for an identification.  1RT 115.

27         The trial court denied petitioner's motion to exclude the identification of petitioner by

28  Flood.  1RT 131.  The court found that the prosecution did not intentionally create this situation.

                                          16

1  1RT 132.  Instead, this was a common problem whenever the police have not bothered to create a

2  lineup prior to the preliminary examination and the witness appears in court and is able to identify

3  the defendant.  1RT 132.  That does not make the in-court identification impermissibly suggestive.

4  1RT 132-133.

5      The Court of Appeal held that the trial court properly denied petitioner's motion to suppress

6  the identification by Flood.

7          At the preliminary hearing, Flood testified that nothing obstructed his view of
   the gunman and the victim, that he looked directly at the gunman and the victim, that
8      he saw the gunman's entire face, and that he did not take his eyes off the scene.  He
   described the gunman as an African-American man, about five feet seven or eight
9      inches, in his early 20's, a description that matched defendant.  He was about 90
   percent certain of his identification.  We recognize that Flood also testified that he did
10     not focus specifically on the gunman's face, but instead on "the whole incident"; that
   he said, apparently inaccurately, that the gunman had a hoodie or beanie cap on his
11     head; and that nearly 11 months had passed between the shooting and the preliminary
   hearing.  However, we conclude that the trial court did not err in finding the
12     identification reliable under the totality of the circumstances.

13         As defendant points out, Flood identified him not in a lineup, but in court, when
   he was in jail clothes and shackled, in circumstances where Flood knew he had been
14     accused of killing Bey.  However, as stated by our Supreme Court in *People v.
   Rodrigues* (1994) 8 Cal.4th 1060, 1155, "[i]nsofar as [a] defendant contends that an
15     in-court identification not preceded by a lineup is impermissibly suggestive and
   prejudicial as a matter of law, he is wrong."  The court rejected the defendant's
16     contention that once a witness had made his in-court identification of the defendant,
   there was no effective way to ameliorate its impact, stating, "[t]o the contrary, it has
17     long been recognized that '[i]n the case of in-court identifications not preceded by a
   lineup . . . , the weaknesses, if any, are directly apparent at the trial itself and can be
18     argued to the court and jury . . . .' [Citations.]"  (*Ibid.*)  "[A]n identification made in
   front of the jury carries with it the circumstances under which it was made, which, in
19     turn, can be argued to and weighed by the jurors."  (*People v. Breckenridge* (1975) 52
   Cal.App.3d 913, 936.)
20
21         The same is true here.  The jury was aware that Flood had seen the gunman's
   face only briefly, and that when he identified defendant at the preliminary hearing,
22     defendant was shackled and sitting at the defense table, and he knew defendant was a
   suspect in the case.  The jury also knew that Flood had not viewed either a
23     photographic or a physical lineup before the preliminary hearing.  Defense counsel
   dwelt extensively on the weaknesses in Flood's identification of defendant during his
24     closing argument.  In the circumstances, we reject defendant's contentions that the
   lineup was impermissibly suggestive, unreliable, and prejudicial, and that admission
25     of the identification evidence deprived him of his constitutional rights.

26  Exh. 2, at 14-15.

27      The Supreme Court has clearly established requirements for pretrial identification

28  procedures, the violation of which will not only preclude the admission of evidence of the pretrial

17

identification itself, but may also preclude a later in-court identification that was tainted by the earlier suggestive procedures.  E.g., *Neil v. Biggers*, 409 U.S. 188, 200-01 (1972); *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Stovall v. Denno*, 388 U.S. 293, 297 (1967).  The contours of the constitutional requirements were set out in this line of cases, indicating when the evidence of the pretrial identification had to be excluded and when an in-court identification, that followed a constitutionally defective pretrial identification, had to be excluded.  The stress in these cases was on the taint that a prior suggestive pretrial identification could have on the later in-court identification.

Due process challenges to identifications follow a two-step test.  The first step is to determine whether the challenged confrontation between the witness and the suspect was "impermissibly suggestive." *Simmons,* 390 U.S. at 384.  If so, the second inquiry is whether, under the totality of the circumstances, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." *Manson v. Braithwaite*, 432 U.S. 98, 116 (1977).

Discussing the due process implications of unnecessarily suggestive identifications, the Supreme Court recently said:

> The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 343–345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); compulsory process, *Taylor v. Illinois*, 484 U.S. 400, 408–409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); and confrontation plus cross-examination of witnesses, *Delaware v. Fensterer*, 474 U.S. 15, 18–20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam). Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability o the evidence presented at trial. See *Kansas v. Ventris*, 556 U.S. 586, 594, 129 S.Ct. 1841, 173 L.Ed.2d 801, (2009) ("Our legal system ... is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses."). Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause. See, e.g., *Najue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (Due process prohibits the State's "knowin[g] use [of] false evidence," because such use violates "any concept of ordered liberty.").

*Perry v. New Hampshire*, ___U.S. ___, ___, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012).

The Court summarized its decisions thus:

18

Synthesizing previous decisions, we set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and reiterated in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.*, at 107, 109; *Biggers*, 409 U.S., at 198. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence. *Brathwaite*, 432 U.S., at 112–113; *Biggers*, 409 U.S., at 198–199.

A rule requiring automatic exclusion, the Court reasoned, would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." *Brathwaite*, 432 U.S., at 112; see id., at 113 (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice").

Instead of mandating a per se exclusionary rule, the Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U .S., at 201; see *Brathwaite*, 432 U.S., at 116. "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation, the Court stated in *Brathwaite*. *Id.*, at 114. Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Id.*, at 114, 116. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.

Applying this "totality of the circumstances" approach, *id.*, at 110, the Court held in *Biggers* that law enforcement's use of an unnecessarily suggestive showup did not require suppression of the victim's identification of her assailant. 409 U.S., at 199–200. Notwithstanding the improper procedure, the victim's identification was reliable: She saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen. *Id.* (internal quotation marks omitted). Similarly, the Court concluded in *Brathwaite* that police use of an unnecessarily suggestive photo array did not require exclusion of the resulting identification. 432 U.S., at 114–117. The witness, an undercover police officer, viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification. *Id.*, at 115. Hence, the "indicators of [the witness'] ability to make an accurate identification [were] hardly outweighed by the corrupting effect of the challenged identification." *Id.*, at 116.

*Perry*, 132 S.Ct. at 724–25.

The second inquiry is essentially whether the identification is reliable. *Id.*

In the instant case, Flood testified that he looked directly at the two men at the gas station. 1CT 29. He could see petitioner's entire face. 1CT 24, 26-27. Flood did not take his eyes off the scene. 1CT 29. He was able to accurately describe the assailant and as well as the assailant's clothing. 1CT 25. In his identification of petitioner at the preliminary examination, Flood

19

1    testified that he recognized petitioner from seeing him at the gas station and got a good look at

2    him.  1CT 34.  Flood was 90 percent sure of his identification of petitioner.  1CT 35.  The 10

3    percent unsure part was due to the fact that the assailant wore a cap or hoodie during the shooting

4    and Flood could not see the assailant's hair.  1CT 36.  At trial, Flood testified that he had 20/20

5    vision and that there were no obstacles blocking his view of the scene.  6RT 1044, 1045, 1082.

6    Flood also testified that he saw the assailant's face and recognized petitioner's face when he saw

7    him in court.  6RT 1086-1087.  He denied that his identification resulted from seeing petitioner in

8    jail clothing.  6RT 1073, 1086.

9        Moreover, the facts upon which petitioner relies to argue impermissible suggestiveness—

10   seated at counsel table and in jail clothes—go to the weight of those identifications and the

11   subsequent trial identifications, not to the admissibility of any of the identifications.  *See People v.*

12   *Rist*, 16 Cal.3d 211, 216 (1976).  "[A]n identification made in front of the jury carries with it the

13   circumstances under which it was made, which, in turn, can be argued to and weighed by the

14   jurors."  *People v. Breckenridge*, 52 Cal.App.3d 913, 936 (1975); *see People v. Rodrigues,* 8

15   Cal.4th 1060, 1155 (1994).

16       Furthermore, petitioner was represented by two attorneys at the preliminary examination

17   when Flood made his identification.  Neither attorney requested that petitioner be excluded from

18   the courtroom to prevent Flood from seeing petitioner before he testified.  Additionally, the

19   defense team never requested to shield petitioner from Flood during his preliminary examination

20   testimony.  Instead, counsel for petitioner thoroughly cross-examined Flood regarding his

21   identification.  1CT 35-99.  Petitioner therefore did not avail himself of available remedies

22   regarding Flood's identification of him and instead chose a different strategy.  He attempted to

23   obtain a retraction of petitioner's identification during the defense's extensive cross-examination

24   of Flood.  The state court reasonably concluded that the identification by Flood was admissible.

25       Moreover, any error was harmless under *Brecht*.  Petitioner confessed to Johnson that he

26   shot and killed Bey.  4RT 736-737, 745-747.  Althea Foy also told Johnson that petitioner killed

27   the victim.  4RT 749.  She said the same to the police.  ACT 2.  Petitioner's fingerprint was found

28   on Bey's BMW.  3RT 585-586.  The .44 caliber cartridges taken from petitioner's trouser pockets

20

1  were the same caliber found in Bey's body.  4RT 753.  Petitioner also had a motive to shoot Bey.

2  This was a "carjacking gone bad" when petitioner tried to take the 22-inch wheels from Bey's car.

3  There was overwhelming evidence that petitioner shot Bey and exclusion of Flood's

4  identification would not have made any difference.

5  **III.  THE STATE COURT REASONABLY EXCLUDED THE DEFENSE VIDEOTAPE**
   **REENACTMENT OF THE SHOOTING**

6

7      In an attempt to impeach Daryl Flood's identification of him, petitioner had Donald Bailey,

8  the 68-year-old president and CEO of Pixar Video Productions, prepare a videotape reenactment

9  of the shooting to show that Flood could not have seen the assailant clearly enough to be able to

10  identify him.  The prosecution objected to the introduction of the video.  Bailey testified that he

11  used a camera that best reflected what the eye was able to see in normal low-light conditions.

12  6RT 1181.  He sat inside a van with flashing lights and filmed the reenactment at the same time

13  as the actual shooting.  6RT 1182.  However, Bailey never spoke with Flood and never showed

14  the video to Flood.  6RT 1187.  He did not know if the camera could record at lighting levels

15  similar to an eye's ability to see at low light levels and he had no idea whether the actors used in

16  the reenactment were of the same age, height, and weight as the victim and the suspect in the case.

17  6RT 1188-1189.  Bailey also agreed with the court that due to the size of the monitor displaying

18  the video; it would reduce everything that was seen.  6RT 1195-1196.

19          THE COURT:  Sure.  Is there a point at which you achieve life-size—what I'll
        refer to as life-size, where it's not reduced?

20

21          THE WITNESS:  Umm –

22          THE COURT:  Let me make it more specific.

23          THE WITNESS:  I understand.

24          THE COURT:  The display we watched on this monitor –

25          THE WITNESS:  It's smaller than life size.  Absolutely, at the end of this, a
        lady walks across the street, and the lady on that monitor was maybe – I don't know –

26        four inches tall.

27          THE COURT:  Either a lady, or a man?

28          MR. ULFELDER:  Man.

                                        21

1          THE COURT:  A man with dreads?  I think a man with dreads.

2          THE WITNESS:  I thought it was a lady.  But they're 12 inches tall, or maybe
   14 inches tall on this monitor.  It's not life-size, obviously, your Honor.

3

4   6RT 1196-1197.

5   The trial court listened to arguments by both sides and ruled that the videotape reenactment

6   was not admissible.

7          I've read your comments.  I'm just going to jump to the bottom line.  I'm not
   going to admit it, and I'll tell you why.  I think *Culpepper* has a good cite.  It says,
8   Admissibility of experimental evidence must prove one of three basic things.  One,
   the experiment must be relevant.  Two, the experiment must have been conducted
9   under substantially similar conditions as those of the actual occurrence.  And three,
   the evidence of the experiment will not consume undue time, confuse the issues, or
10  mislead the jury.

11         It goes on to say:  In determining relevance, the question is whether the
   experiment has any tendency and reason to prove or disprove any disputed fact that's
12  of consequence to the determination of the action.  It's not necessary, by the way, that
   the conditions be identical.  Substantially similar is the rule.  But I think you have to
13  take into account the purpose for which it's being offered, if the purpose for which
   it's being offered is to show whether Mr. Flood could or couldn't see what he claimed
14  he saw, and identify a person.  From that, it seems to me that the foundation for it has
   to be scrutinized all the more carefully than if it was just, for example, to show
15  relative positions of people, without regard to what they could or couldn't see.

16         It seems to me, if an experiment is being conducted, to determine whether Mr.
   Flood could have seen what he said he saw, then number one, substantially similar, I
17  think you've got to get a lot closer to identical before you can validly use such an
   experiment, without it being misleading to the jury.  And that's the problem here.  I
18  noticed – watching this video – that the people were positioned, number one, in
   places that I don't necessarily know where they were.  Example: Mr. Flood said
19  when he first got out of the car and started taking off, his first impression was he was
   coming right at him, and then – so he started – he put his car in reverse, and then the
20  person headed down 55th.  That suggests to me that the person was, in fact, going
   right toward Mr. Flood.  That video – how could we possibly recreate this? . . . .
21
          Here's the biggest problem I have with – I don't have an issue with the time,
22  the day, the lighting.  The big problem I've got is, even by this witness's testimony,
   what we're watching here is a reduced version of the view of the camera.  How could
23  we possibly expect this to be an accurate test, for the jury to see, of whether Mr.
   Flood could or couldn't see these things, if it's not even life-size, from that standpoint.
24  Regardless of what this witness says about other aspects of his testimony, I do not
   believe that this video recreates what a human eye would see that was – or a person at
25  that location, at that time, if for no other reason, because of the reduction that takes
   place in the viewing, and I think that that has a very definite potential to mislead the
26  jury.

27         It seems to me, the only way such a test could be valid is if it's absolutely life-
   size.  It would have to be life-size, and it's not, by this witness's testimony.  So I find
28  that it's – that it has the potential – too much potential to mislead the jury.  And

                                         22

because of its reduction, it does not have a sufficient tendency and reason to prove or disprove the disputed fact.  Therefore, I'm ruling that it's not admissible.

6RT 1200-1202.

The Court of Appeal agreed with the trial court:

> The videotape here was offered to show that Flood could not have been able to see the killer well enough to recognize him from the vantage point at which his vehicle was stopped.  The trial court could reasonably conclude that the reduced-sized images visible on the videotape of the reenactment would not accurately represent what Flood was able to see, and accordingly would not assist the jury in making its determination.  We see no abuse of discretion . . . . [¶] Therefore, we conclude the trial court did not abuse its discretion in making the challenged rulings, and reject defendant's contention that he was thereby deprived of his constitutional rights to confrontation, to present a defense, and to due process of law.

Exh. 2, p. 17.

As stated earlier, federal habeas review does not lie to review a state court's evidentiary ruling, unless it was so prejudicial as to constitute a violation of due process.  *Estelle v. McGuire,* 502 U.S. at 67.

A defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400 at 410.  The exclusion of even relevant evidence does not violate due process, unless the state court's ruling offends a "fundamental principle of justice." *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996).  "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions" as set forth in the state's evidentiary rules. *United States v. Scheffer*, 523 U.S. at 308.  A due process violation arises only where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense. *Chambers v. Mississippi*, 410 U.S. at 302.

Under state law, while a trial court has discretion to admit evidence of an experiment or test conducted out of court, the proponent of such experimental evidence bears the burden of production and proof as to whether the proffered evidence rests upon an adequate foundation. *People v. Bradford,* 15 Cal.4th 1229, 1326 (1997); *see also* Cal. Evid. Code, § 403.  Specifically, admission of experimental evidence depends upon proof of four foundational criteria:

23

[t]he experiment must be relevant; (2) it must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence; (3) the qualifications of the individual testifying concerning the experimentation must be demonstrated with some particularity; and (4) evidence of the experiment will not consume undue time, confuse the issues, or mislead the jury.

*Id.,* quoting *People v. Turner,* 8 Cal.4th 137, 198 (1994).

Admissibility is contingent upon proof that such evidence will at least assist the jury's determination of the matter in dispute. *People v. Terry,* 38 Cal.App.3d 432, 445 (1974) (trial court must decide whether offered evidence is "of any value in aiding the jury;"), *see also,* e.g., *People v. Manson,* 71 Cal.App.3d 1, 44 (1977) (trial court did not abuse its discretion in denying defendant's request for a "screaming line-up," as witness's ability or inability to identify line-up voices would have had no probative value as to whether she was able to, and/or did, identify the voice of the screaming murder victim on the night in question.).

Moreover, petitioner must also establish the foundational requirement that the witness's experiment was performed under "substantially similar conditions" as the actual occurrence. *People v. Bonin* 47 Cal.3d 808, 847 (1989). In *Bonin,* the California Supreme Court found error in the admission of evidence regarding an experiment conducted to determine whether ligature marks on the victim's neck could have been made by a t-shirt (as a witness had testified). At trial, a prosecution criminalist was permitted to testify that he had wrapped a t-shirt around his upper arm and concluded that the striations produced were in fact similar to those found on the decedent's body. *People v. Bonin,* 47 Cal.3d at 846. The state high court held this evidence was inadmissible because its proponent of the experimental evidence failed to adequately demonstrate that the criminalist's arm and the victim's neck were of similar circumference, and/or that the force applied during the experiment was similar to that allegedly applied by the defendant. *Id.* at 847.

In the instant case, petitioner wanted the videotape reenactment to show that Flood could not have seen the assailant clearly enough to be able to identify him. In order for the videotape reenactment to be relevant for this purpose, it had to present the jury with the same detail, clarity and perspective as what Flood saw that evening. Viewing a reenactment on a 20 or 24 inch

24

1   television screen would not show whether Flood could have identified petitioner.  As the court

2   noted, the figures on the television screen were merely 12 inches tall.  6RT 1197.  The trial court

3   determined that the reduction in the size of the individuals on the television screen did not

4   recreate what a human eye would see at that location.  6RT 1202.  The videotape reenactment was

5   therefore not relevant to show whether Flood could have identified petitioner.  Evidence with

6   such absent or weak probative value could not have been critical or trustworthy, such that its

7   exclusion rendered the trial unfair.  As such, the state court's decision was not contrary to or

8   involved an unreasonable application of, clearly established federal law, as determined by the

9   United States Supreme Court.  Further, in light of the weakness of the evidence, any error was

10  harmless under *Brecht*.

## IV.   THE STATE COURT REASONABLY REFUSED TO GRANT PETITIONER PERMISSION TO REOPEN HIS CASE AND RECALL DWIGHT JOHNSON

### A.   Dwyane Johnson's Testimony Trial

14  Dwayne Johnson testified as a prosecution witness and said that he was presently

15  incarcerated at Santa Rita and charged with three robberies along with Three Strike prior

16  conviction allegations.  4RT 730.  He admitted to an extensive criminal history that included

17  convictions for robbery, burglary, grand theft, as well as for various drug offenses.  4RT 730.  He

18  has served time in state prison and considers himself a drug addict who supports his drug habit by

19  committing crimes.  4RT 731.

20  Johnson was expecting some kind of consideration for his testimony at petitioner's trial.

21  4RT 734.  However, he was not offered any deal on his robbery case for testifying.  4RT 733.  He

22  spoke to the Oakland Police Department about the information he had regarding this case long

23  before he was ever arrested on the case for which is now being incarcerated.  4RT 734.

24  Johnson testified in another murder trial four years ago and received a $1,000 reward from

25  "Crime Stoppers."  4RT 735.  He considers himself an informant for the police department and

26  have provided Officer Marcus Midyett with information in about 10 to 15 cases.  4RT 735-736.

27  Johnson talked to Midyett on October 25, 2005 and provided him with information about

28  this case.  4RT 736.  He was expecting to receive money for providing information but that was

25

1   not the primary reason for talking to the officer.  4RT 736.  This was a case involving the killing

2   of an innocent victim.  Johnson had seen the victim on television over the years and he did not

3   deserve to be killed.  4RT 738.  Johnson also admitted that he had a fight with petitioner over

4   drugs.  4RT 740-742.  However, Johnson did not call Midyett with the information because he

5   was mad at petitioner over the drug deal.  4RT 742.

6          On cross-examination, Johnson admitted to being a career criminal who provided

7   information to the police in order to get money.  4RT 768.  Nevertheless, he denied providing

8   information in order to get a better deal in his own case.  4RT 768.  Johnson testified that he

9   would provide information to the police in order to get a better deal.  4RT 768.

10          Johnson told counsel for petitioner as well as a defense investigator on October 10 that he

11   would come in to testify if the prosecution would give him a deal.  4RT 770.  However, he said

12   that the prosecution was unwilling to give him any deal.  4RT 770.  Johnson said he "wouldn't

13   come in here unless the deal was signed, sealed, and delivered."  4RT 770.

14          Johnson testified at petitioner's trial as a good citizen.  "Well, I turned my life over to

15   God."  4RT 771.  He was a "changed man" even though Johnson subsequently went out and

16   committed four armed robberies.  4RT 772.

17          **B.     Petitioner's Motion To Recall Dwayne Johnson**

18          After petitioner rested his case and the prosecution indicated that it had no rebuttal evidence

19   to offer, petitioner moved to recall Dwayne Johnson in order to impeach him with statements he

20   made during the interview he had with defense counsel and the defense investigator.  6RT 1250-

21   1252.  According to defense counsel, Johnson said in the interview that he spoke to the district

22   attorney about his pending case.  The district attorney patted petitioner's case file and said,

23   "We're going to take care of you."  6RT 1253.  Johnson said that the district attorney informed

24   him that petitioner's case was more important than his robbery cases because it was a murder case.

25   6RT 1253.  The prosecutor told Johnson not to worry about his present case.  6RT 1253.  Defense

26   counsel wanted to recall Johnson so he could then elicit testimony from the defense investigator

27   to impeach Johnson.  6RT 1253.

28

1    The trial court noted that Johnson had been excused following his testimony and had not

2    been excused subject to recall.  6RT 1254-1255.  Since Johnson had not been confronted with this

3    statement during his testimony, he couldn't be impeached with the statement and would have to

4    be recalled and given the opportunity to explain the statement.  6RT 1255.  The district attorney

5    responded that if Johnson was confronted with this information and impeached with it, she would

6    introduce other statements by Johnson to show that they were consistent with his testimony.  6RT

7    1255.

8    The trial court issued its ruling:

9        All right.  And to finalize the summary of the discussions that went on while we
     were waiting for Mr. Phillips to arrive, my response to all of that was, in order to
10       recall Mr. Johnson, you'd have to do it with the Court's permission, since he's been
     excused.  And I'm inclined not to grant that request, since he has been excused.  And
11       I'm inclined not to grant that request, because I see that turning into a whole new
     minitrial on the question of promises and the prior statement, and I wasn't willing to
12       do that.  I felt that this is something that could easily – he could have been asked at
     the time he testified, and it would have been all taken care of, if he had been asked
13       that, and the trial not prolonged.

14       But I also made this observation, and I'm making it now, that it really adds
     nothing of any real substance to this trial.  Because even though Mr. Johnson said
15       nobody has made any promises to him, it's pretty obvious – I think everybody can
     figure out that the obvious motivation that would exist for anybody in his situation,
16       particularly since he confessed on the witness stand here to the charges he's facing, as
     a three-striker, his only real hope is to try to get the favor the district attorney and
17       work some kind of miracle deal in his case.  And I think that the evidence is there for
     argument by Mr. Ulfelder, with or without his testimony, and I don't think it would
18       really add much of anything to it.

19       So I felt that to deny Mr. Ulfelder the opportunity to recall Mr. Johnson
     wouldn't be denying him or his client of anything of any real significance, but it
20       certainly would have a tendency to prolong this trial, and ultimately, maybe confuse
     the issues a little bit needlessly.
21
        And so the bottom line is this:  In our conversation at sidebar, I made it clear
22       that my inclination would be to exercise my discretion under section 352 of the
     Evidence Code and exclude that evidence for the reasons that I've spelled out.  That's
23       my summary of what has also taken place. . . .  And so that's what I'm ruling under
     352 of the Evidence Code.  The evidence – I will – I'm not going to grant permission
24       to recall Mr. Johnson as a witness for purposes of eliciting that testimony for the
     reasons spelled out.  Now you've got a nice, complete record on that, unless there's
25       something else you would like to add to it.

26   6RT 1256-1257.

27   The California Court of Appeal concluded that the trial court made the correct decision.

28

27

Defendant contends the statements Johnson allegedly made to his investigator were inconsistent with his testimony at trial, and that they were admissible because Johnson had been so examined as to give him an opportunity to explain or deny the statements.  (Cal. Evid. Code, § 770(a).)  We reject this contention.  The prosecutor asked Johnson at trial whether she had given him a deal on his robbery case, and whether she had told him that if he testified he would be "a free man," and Johnson testified that the prosecutor had not done so.  He also testified that he was facing a possible sentence of 25 years to life and expected some consideration for his testimony.  At no point was Johnson asked to explain or deny his statements to the investigator or to explain any discrepancy between those statements and his trial testimony.  [Citation.]

Nor do we see any abuse of discretion in the trial court's decision not to recall Johnson to explain or deny the statements.  (See Evid. Code, § 778 [leave to recall witness who has been excused may be granted or withheld in court's discretion]; *People v. Thomas* (1992) 2 Cal.4th 489, 542 [reviewing refusal to allow defense counsel to reopen examination of witness for abuse of discretion]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 327 [same].)  Nothing had prevented defendant from cross-examining Johnson about his statements during the prosecution's case.  More importantly, the evidence had limited significance, as Johnson had come forward as a witness shortly after Bey was killed, and before he had committed the crimes with which he had been charged at the time of trial.  Furthermore, it would have added little to what the jury already knew from Johnson's testimony:  Johnson had testified that he was facing a possible sentence of 25 years to life, and that he expected to receive some consideration for his testimony.

Exh. 2, at 19-20.

The United States Supreme Court has held that "[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. at 410; *Montana v. Egelhoff,* 518 U.S. 37, 42. Relevant evidence may be excluded on account of a defendant's failure to comply with procedural requirements. *Montana v. Egelhoff,* 518 U.S. at 42; *Michigan v. Lucas,* 500 U.S. 145, 151. As the court stated, "Any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence.  For example, Federal (and Montana) Rule of Evidence 403 provides: 'Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of evidence.' [Citation.]" *Montana v. Egelhoff* 518 U.S. at 42.

The Constitution does not guarantee that a criminal defendant may call every witness it chooses. *United States v. Scheffer,* 523 U.S. 303, 308; *Khaalid v. Bowersox,* 259 F.3d 975 (8th Cir. 2001).  The state has broad latitude under the Constitution to establish rules excluding

28

1  evidence from criminal trials. *Id.* Indeed, a trial judge retains wide latitude to limit defense

2  counsel's questioning of a witness without violating a defendant's Sixth Amendment rights.

3  *Michigan v. Lucas* 500 U.S. at 151; *Carriger v. Lewis,* 971 F.2d 329, 333 (9th Cir. 1992). A

4  defendant must comply with established rules of evidence and procedure. *Carriger v. Lewis,* 971

5  F.2d at 333; *Perry v. Rushen,* 713 F.2d at 1450. The court has "considerable discretion to limit

6  cross-examination in order to prevent delay or avoid cumulative evidence." *United States v.*

7  *Gomez,* 846 F.2d 557, 559 (9th Cir. 1988.)

8      In California, after a witness has been excused from giving further testimony in the action,

9  he cannot be recalled without leave of the court. Leave may be granted or withheld in the court's

10  discretion. Cal. Evid. Code § 778. The trial court's denial of a request to recall a witness is

11  reviewed for an abuse of discretion. *People v. Cooks,* 141 Cal.App.3d 224, 328 (1983).

12  Furthermore, "[i]n determining whether a trial court has abused its discretion in denying a defense

13  request to reopen, the reviewing court considers the following factors: '(1) the stage the

14  proceedings had reached when the motion was made; (2) the defendant's diligence (or lack

15  thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new

16  evidence undue emphasis; and (4) the significance of the evidence.' (*People v. Funes* (1994) 23

17  Cal.App.4th 1506, 1520.)" *People v. Jones*, 30 Cal.4th 1084, 1100 (2003).

18      Applying the factors set forth in *Jones,* first, the defense request came at an extremely late

19  stage in the proceedings. Both the prosecution and the defense had rested their case and informed

20  the court that they had no further evidence to present. The case was ready for argument and

21  instructions.

22      Second, the defense could easily have introduced evidence concerning Johnson's

23  statements to the defense investigator during cross-examination of the prosecution witness, or

24  during the defense case. The defense had access to the defense investigator's report which

25  indicated that such evidence might be relevant, and of course the defense was in the best position

26  to know whether the defense investigator's report had relevant material to impeach Johnson's

27  testimony. "Whether a defendant exercised due diligence to locate a missing witness or discover

28  new evidence is relevant to the issue of abuse of the court's discretion in denying a motion to

29

reopen . . . ." *People v. Green,* 27 Cal.3d 1, 42 (1980).  Here, the evidence was not even "new"; it was merely overlooked.  This case stands in stark contrast to those cases where reviewing courts have found that trial courts have abused their discretion by rejecting a defense motion to reopen.  In those cases the defense, through no fault of its own, discovered highly relevant evidence late in the proceedings.  *See People v. Carter,* 48 Cal.2d 737, 742-743, 757 (1975); *People v. Frohner*, 65 Cal.App.3d 94, 102-103, 109-110 (1976); *People v. Newton,* 8 Cal.App.3d 359, 382-383 (1970).  Instead, this is a case where defense counsel had full access to the evidence before trial, but for tactical reasons or because of inadvertence and neglect he did not introduce the evidence.

Third, "one of the reasons underlying the requirement of diligence is that a jury may accord undue weight to evidence which is admitted close to the time deliberations begin."  *People v. Rodriguez,* 152 Cal.App.3d 289, 295 (1984).  Here, the evidence would have come in after Johnson had already been excused and after the parties had indicated that they had no further evidence to present.  The jury may have given the evidence more weight that it deserved, and put the prosecution at an unfair advantage.

Finally, the evidence was far from critical or trustworthy.  Johnson was thoroughly questioned and cross-examined regarding his motivations in testifying for the prosecution.  The jury was aware that Johnson was charged with Three Strikes offenses and faced a 25 to-life term in prison.  They also knew that Johnson had confessed to committing the crimes.  Johnson said he had expected consideration from the prosecution for his testimony.  Johnson's motivation in testifying was obvious and, as the trial court stated, this evidence would not have added anything of significance to petitioner's case.  Indeed, the prosecution added that it would consume an undue amount of time since it would have to introduce evidence of other consistent statements Johnson made in this regard.

Looking at all the facts, the trial court did not violate petitioner's constitutional rights when it denied his request to recall Dwayne Johnson.  The Court of Appeal's decision was not contrary to or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court and *Brecht*.

30

V.   THE STATE COURT REASONABLY DENIED PETITIONER'S REQUEST TO REOPEN THE
     CASE BASED ON A SAN FRANCISCO CHRONICLE ARTICLE

Petitioner rested his case on November 7, 2007.  6RT 1250-1251.  Six days later and when the parties came into court for jury instructions and argument, petitioner advised the court that in the Sunday San Francisco Chronicle there was an article that highlighted the relationship between Sergeant Derwin Longmire and Yusef Bey, IV.  8RT 1418.  This relationship began at approximately the time when Yusef had problems at the bakery.  8RT 1418.  In a case that involved a liquor store vandalism that occurred in November 2005, Sergeant Longmire allegedly intervened on behalf of Yusef Bey, IV.  8RT 1418-1419.  Counsel for petitioner claimed that he was unable to cross-examine Longmire concerning any relationship he may have had with Yusef Bey, IV, and also explained why the Muslims had early information about the case.  8RT 1420.

Defense counsel requested permission to reopen the case to be able to cross-examine Sergeant Robert Nolan on these issues as well as Sergeant Longmire and the lead investigator in the liquor store vandalism case.  8RT 1421.  The prosecution objected to reopening the case.  The district attorney asserted that this request was based on a newspaper article and the assumption that everything in the article was true and accurate.  8RT 1422-1423.  All inferences were based on speculation.  Moreover, even assuming the truth of the article, the relationship between Longmire and Yusef Bey, IV postdated the case.  8RT 1423.

> This is not *Brady* information, that even if it were true, I would be responsible for turning over, because it's not – it's simply not exculpatory.  The dates don't match up.  There are no pre-existing relationship between Sergeant Longmire and the Bey family at the time that he participated in the investigation of Antar Bey's murder.  And furthermore, this relationship is between Antar Bey, the victim in this case, and his younger brother, the relationship that's at question here.  There wasn't a relationship between Sergeant Longmire and Antar Bey.  You know, all this is speculative, and it's overreaching.  And quite frankly, I would strongly suggest that Sergeant Longmire is most likely taking great issue with most of the facts that are reported in that article.

8RT 1423-1424.

The trial court denied petitioner's motion to reopen the case.

> Okay.  The request to reopen is denied.

31

I want to mention one other thing.  You mentioned, Mr. Ulfelder, that the subject of cross-examination of Sergeant Longmire – at least this is the way I understood it – would include questioning how, and perhaps others would include questioning how, according to Mr. Johnson, some Muslims ended with a photograph of Mr. Phillips and was looking for Mr. Phillips.  I don't see that as being productive or in any way supported by the evidence, because the police never even heard, in terms of this case, of Mr. Phillips, until Mr. Johnson went to them.  That's the first time that Mr. Phillips' name even became part of this investigation.  And as you said, Mr. Johnson testified that there were some people associated with the bakery that were going around looking for Mr. Phillips and showing his photograph before that time.  So that just doesn't really jive with the evidence in this case.

Also, I will note that, basically, the main thrust of Sergeant Longmire's testimony had to do with interviewing Althea Foy, and also Mr. Johnson, but really primarily Althea Foy, if I remember correctly.  And there were many things that he didn't do during the investigation – he wasn't involved in for a variety of reasons, but it seems to me that's what – if he had been involved more in the investigation, it would be more fruitful to pursue that.  Being involved less in the investigation makes all that less relevant, I think.

And finally, as Ms. McMahon has pointed out, this is all based on a newspaper article, which I don't think should necessarily assume that there is hundred percent truth to.  At any rate, I don't think that denying the defendant's request to reopen and bring in witnesses and cross-examine witnesses that have been previously been cross-examined, and perhaps call Sergeant Brock, which I think is one of the requests also, it doesn't appear to me that denying that request denies the defendant in way of a fair trial here, because I really just don't see the relevance or benefit of calling those witnesses – or recalling those witnesses to explore this.  Your request is a matter of record.

8RT 1424-1426.

The appellate court rejected the claim on appeal:

We review a trial court's ruling on a request to reopen the case for abuse of discretion, taking into consideration (1) the stage of the proceedings, (2) the defendant's diligence in presenting the new evidence, (3) the prospect that the jury would accord the new evidence undue emphasis, and (4) the significance of the evidence.  (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

We see no abuse of discretion here.  Although the jury had not yet received its instructions and the request to reopen was made promptly after the Chronicle article appeared, the third and fourth factors weighed against reopening.  The jury might well accord undue emphasis to the evidence under the circumstances.  More importantly, whatever might have occurred in the vandalism investigation, nothing in the evidence suggested that Longmire improperly intervened in the *Bey* investigation.  Both Nolan and Longmire testified that they were partners in investigating homicides, and that in the Bey investigation, Nolan was the lead investigator.  Nolan testified that he met with Johnson when he came to the police station, and denied that either he or Longmire threatened Foy during their interview with her.  Moreover, Johnson approached Midyett first with information about the case.  There is no basis to conclude that Longmire improperly caused Johnson to implicate defendant or that the information in the article was material exculpatory evidence.  In the circumstances,

the trial court could properly conclude the evidence was not sufficiently relevant or probative to justify reopening the case.

Exh. 2, at 21.

As discussed in the previous argument, a defendant does not have the unfettered right to present any evidence he desires.  The state has broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  *United States v. Scheffer* 523 U.S. at 308; *Taylor v. Illinois,* 484 U.S. at 410; *Montana v. Egelhoff,* 518 U.S. at 42.  A trial judge retains wide latitude to limit defense counsel's questioning of a witness without violating a defendant's Sixth Amendment rights.  The trial court here correctly followed established state procedures and properly exercised its discretion.  *People v. Cooks,* 141 Cal.App.3d at 328.

Here, the request was made at a very late stage in the proceedings, six days after the defense had rested its case.  The parties appeared in court for arguments to the jury and for the court to give its instructions.  The trial court was not unreasonable in denying a request at this point of the proceedings.  There is also the danger in reopening the case at this late stage that the jury would accord undue emphasis to the evidence.  After all, Sergeants Nolan and Longmire had both been excused long ago and not only would they now appear to testify again but the defense would now also present new witnesses.  The presentation of all this new evidence at this point would certainly have confused the jury and would have put undue emphasis on the evidence.

The evidence was also far from critical or trustworthy.  Petitioner asserted that this evidence would have been used to attack the credibility of Sergeant Longmire.  However, Longmire only talked to Johnson for about 20 minutes (2RT 298) and Sergeant Nolan was present with Longmire during the interviews of Vidal Hughley and Althea Foy.  2RT 301-308.  Those interviews were also taped.  His testimony added very little to the prosecution's case and his role in the Antar Bey murder was minor.  Indeed, Longmire's credibility was not at issue in the case.  Moreover, petitioner's request for reopening the case was based on speculation.  A newspaper article that alleged that Longmire had a relationship with a member of the victim's family sometime after Antar Bey's murder is simply of insufficient significance to justify the reopening of the case.

1   The Court of Appeal's decision upholding the trial court's decision was not contrary to or

2   involved an unreasonable application of, clearly established federal law, as determined by the

3   United States Supreme Court and *Brecht*.

4   **VI.   THE PROSECUTION DID NOT COMMIT MISCONDUCT**

5   Petitioner contends that the prosecutors, Dolge and McMahon, committed misconduct.

6   First, he argues Dolge committed misconduct when, without notice to defendant or a prior lineup,

7   he asked Flood at the preliminary hearing whether he recognized anyone in the courtroom.

8   Second, he contends misconduct occurred when the prosecutors told the jury about the

9   standard of proof during the preliminary hearing.  In her opening statement, McMahon explained

10  to the jury that it would hear references to the preliminary hearing, and that "a preliminary

11  hearing is a hearing where evidence is presented to a judge to make sure that there's enough

12  evidence to continue prosecuting the defendant."  Called as a witness at trial, Dolge testified

13  about the circumstances under which Flood had identified defendant at the preliminary hearing as

14  the gunman he saw shot Bey.  In the course of the examination, McMahon asked Dolge to

15  describe to the jury what a preliminary hearing was, and he replied, "A preliminary hearing is a

16  hearing in front of a judge, in which it's our job to present enough evidence to merit going

17  forward with a trial.  The standard of proof is lower.  It is just for the judge to determine whether

18  there's probable cause to hold the defendant for trial, on the charges that we have filed."

19  Third, he argues that McMahon committed misconduct in closing argument by "unfairly

20  exploiting" the trial court's ruling excluding evidence of third party culpability by arguing there

21  was no evidence to support defense counsel's argument that the killing was not a "carjacking

22  gone bad," but rather was committed by someone with inside information about Bey's activities;

23  by making herself her own witness when she told the jury she had "time and time again" seen the

24  defense tactic of coming up with a speculative theory of how the crime occurred; and by telling

25  the jury it must not speculate.

26  Petitioner has defaulted on these prosecutorial misconduct claims.  He failed to make any

27  objection in the trial court and the California Court of Appeal found that he had waived all three

28  claims.

34

1
2
3
4

> Defendant did not make a timely objection to any of the instances of alleged misconduct of which he now complains, and thereby waived his claims. A timely objection at the preliminary hearing would have allowed the court to consider whether to allow Flood to answer when asked whether he recognized anyone in the courtroom. Likewise, we see no reason that a timely objection and request for admonition would not have cured any harm from the other instances of alleged prosecutorial misconduct.

5    Exh. 2 at 22-23.

6    For reasons of comity, the federal courts "will not review a question of federal law decided

7    by a state court if the decision of that court rests on a state law ground that is independent of the

8    federal ground and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729

9    (1991). The federal courts have recognized that California's contemporaneous objection rule

10   constitutes a valid procedural default. *See Ylst v. Nunnemaker*, 501 U.S. 797, 799, 806 (1991);

11   *Fairbank v. Ayers,* 650 F.3d 1243, 1256 (9th Cir. 2011) ("California consistently applies its

12   contemporaneous objection rule when a party fails to object to the admission of evidence.").

13   California's contemporaneous objection requirement is well established. Cal. Evid. Code §

14   353. The Supreme Court has recognized that this state rule constitutes a valid procedural default.

15   *Ylst v. Nunnemaker*, 501 U.S. at 799, 806 (failure to object to confession on *Miranda* grounds);

16   *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (failure to object to confession). Likewise, the Ninth

17   Circuit has repeatedly held that this rule precludes federal habeas review. *Jackson v. Giurbino*,

18   364 F.3d 1002, 1006-1007 (9th Cir. 2004) (failure to object to *Doyle* error in prosecutor's closing

19   argument); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999) (failure to object to

20   prosecutorial misconduct in closing argument); *Bonin v. Calderon,* 59 F.3d 815, 842-843 (9th Cir.

21   1995) (failure to object to testimony on grounds that prosecutor promised not to use statements);

22   *Featherstone v. Estelle*, 948 F.2d 1497, 1506 (9th Cir. 1991) (failure to object to prosecutorial

23   misconduct in closing argument).

24   Petitioner has therefore procedurally defaulted on the prosecutorial misconduct claim.

25   In any event, the Court of Appeal also reasonably rejected petitioner's contentions on the

26   merits:

27
28

> We have already concluded that the trial court did not abuse its discretion in admitting evidence of Flood's identification. We have likewise concluded that the proffered evidence of third party culpability was properly excluded because it did not

35

serve to link a third person to the perpetration of the crime.  Thus, unlike the prosecutor in *People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758, upon which defendant relies, the prosecutor here did not comment unfairly on an erroneous ruling excluding the evidence.  (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [distinguishing *Daggett* and *People v. Varona* (1983) 143 Cal.App.3d 566 on ground they involved *erroneous* evidentiary rulings on which prosecutor improperly capitalized during closing argument].)  The prosecutor's remark that she had "time and time again" seen a defendant present a speculative theory was brief, and the jury was instructed that statements made by the attorneys were not evidence.  There is no basis to conclude that the comment, even if improper, affected the verdict.  (See *People v. Schmeck* (2005) 37 Cal.4th 240, 290.)  As to comments about the standard of proof at the preliminary hearing, the jury was told that the standard there was lower than at trial.  Moreover, the comments did not amount to an argument that the fact defendant had been held to answer was evidence of his guilt.  (See *People v. Conover* (1966) 243 Cal.App.2d 38, 48.)

Nothing in the comments defendant challenges constituted an egregious pattern of conduct that made the trial unfair or involved the use of deceptive or reprehensible methods to persuade the court or the jury.  (*Hill*, *supra*, 17 Cal.4th at p. 819.)

Exh. 2, at 23.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  Habeas relief is warranted only if the prosecutor's comments in closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted); *see Parker v. Matthews*,___, U.S. ___, ___, 132 S.Ct. 2148 (June 11, 2012) (per curiam) (*Darden* constitutes the relevant clearly established Supreme Court law for claim of prosecutorial misconduct based on closing arguments).  Because the standard of review on federal habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power," even improper argument does not necessarily violate a defendant's constitutional rights. *Id*. at 180.  In *Darden*, the prosecutor made "offensive comments reflecting an emotional reaction to the case" during closing argument, which the Supreme Court held were improper.  *Id*.  The Supreme Court concluded that the argument did not rise to the level of a due process violation, because it did not manipulate or misstate the evidence, implicate other rights such as the right to counsel or the right to remain silent, and was invited by the defense argument; the trial court instructed the jurors that their decision was to be made on the basis of the evidence alone and that the arguments of counsel were not evidence; and the evidence clearly supported a finding of guilt on all charges.  *Id*. at

36

1   182; *see Brown v. Payton*, 544 U.S. 133, 143-147 (2005) (state court's conclusion that jury was

2   not misled was not unreasonable, where prosecutor erroneously argued that jury could not

3   consider defense mitigation evidence of postcrime conduct, but that evidence was admitted at trial

4   and defense counsel argued it could be considered).  Under AEDPA, the question is whether the

5   state court's application of these principles was unreasonable.  *Payton*, 544 U.S. at 143 ("Even on

6   the assumption that its conclusion was incorrect, it was not unreasonable, and is therefore just the

7   type of decision that AEDPA shields on habeas review.").

8          Petitioner first argues that the district attorney's question to Flood about whether he

9   recognized "anyone here in court today from that evening at the gas station?" amounted to

10   misconduct because he had exposed petitioner to an unduly suggestive identification procedure

11   without notice to counsel.  As respondent has already discussed in response to Argument II

12   earlier, the prosecutor did not subject petitioner to an unduly suggestive identification procedure.

13   Respondent incorporates the discussion Argument II.  The singling out of petitioner in the

14   courtroom for "possible identification without more, is not a process which requires reversal."

15   *United States v. Domina*, 784 F.2d at 1370-1371; *see People v. Breckenridge*, 52 Cal.App.3d at

16   936.  It has long been recognized that "[i]n the case of in-court identifications not preceded by a

17   lineup . . . the weaknesses, if any, are directly apparent at the trial itself and can be argued to the

18   court and jury without the necessity of depending on an attempt to picture a past lineup by words

19   alone."  *People v. London*, 274 Cal.App.2d  241, 242-243 (1969); *see People v. Breckenridge*, 52

20   Cal.App.3d at 935-936.)  Notice to defense counsel was not required; defense counsel was present

21   at the preliminary hearing.  For the reasons already specified in Argument II, the prosecutor's

22   conduct did not subject petitioner to an unduly suggestive identification procedure.

23          The prosecutor's comments about the standard of proof at the preliminary examination also

24   did not constitute misconduct.  During the prosecution's opening statement, the district attorney

25   stated,

26          Althea [Foy] also testified at the preliminary hearing in this case last year.  You will
            hear references to that preliminary hearing throughout this trial, because several
27          witnesses testified.  Now, a preliminary hearing is a hearing where evidence is
            presented to a judge to make sure that there's enough evidence to continue

28

37

1    prosecuting the defendant.  Mr. Greg Dolge was the deputy district attorney who
     prosecuted this case at the preliminary hearing.
2

3    2Supp RT 392.

4        The prosecutor subsequently called Greg Dolge as a witness, who testified that he was

5    assigned to prepare the preliminary examination in the case.  6RT 1091-1092.  The prosecutor

6    then asked Dolge to explain preliminary examination to the jury.  6RT 1092.

7        A preliminary hearing is a hearing in front of a judge, in which it's our job to present
         enough evidence to merit going forward with a trial.  The standard of proof is lower.
8        It is just for the judge to determine whether there's probable cause to hold the
         defendant for trial, on the charges that we have filed.
9

10   6RT 1092-1093.

11       Petitioner insisted that these comments by the prosecutor constitute misconduct because the

12   prosecutor was enlisting the other judges as highly persuasive witnesses for the prosecution.

13   There is no merit to petitioner's contention.

14       The prosecutors' comments merely let the jury know about the purpose of the preliminary

15   examination.  This was necessary since there was testimony concerning evidence taken from the

16   preliminary hearing.  The prosecution carefully explained that the standard of proof is lower at

17   the preliminary hearing and the prosecution only presents sufficient evidence for the judge to

18   determine whether to hold petitioner over for trial.  There is nothing inflammatory about these

19   comments.

20       Several witnesses in the instant case testified about evidence from the preliminary hearing.

21   The prosecutors here merely explained the preliminary hearing proceedings to the jury.  It

22   specifically explained that the hearing was conducted simply to determine whether there was

23   probable cause to hold the defendant for trial and that the standard of proof was much lower at the

24   preliminary hearing than at trial.  This was a correct statement of the law and did not impart to the

25   jury the impression that other judges and juries had earlier come to the conclusion that petitioner

26   was guilty of the offenses.  No misconduct occurred.

27

28

1    Finally, respondent submits the prosecutor properly argued to the jury that there was no

2    evidence presented to support petitioner's claim that the victim was killed by other Black

3    Muslims.

4    During his argument to the jury, counsel for petitioner asserted that this was not an

5    attempted carjacking but an intentional killing aimed specifically at Antar Bey by someone with

6    inside information about where Bey would be:

> Now, who would know that Mr. Bey would be there? Who would know to get
> to the other gas station first? Someone had some inside information. Someone who
> knew Mr. Bey. Someone who got inside information as to where Mr. Bey would be
> at that time.
>
> Now, remember the guy on the telephone, the last phone call? Remember
> Sergeant Nolan said he never investigated that last phone call and who he was talking
> to. Don't you think that would have been a crucial importance to know what that
> person heard on the phone, as to whether or not this was a carjacking or just a plain
> ole hit? . . . .
>
> It's not about a carjacking. It's about a killing, and it's about them coming here
> for a reason to kill, and to get something out of that car that they knew was in the car,
> because they knew Mr. Bey. And they knew what they were looking for in that car,
> and that's what happened in this case. It was an intentional killing. It had nothing to
> do with the carjacking. If you want to carjack someone, and you've got a getaway car,
> and you want to do a carjacking, I'm gonna tell you how to do it, especially if you're
> trying to plan it like to look like these guys were trying to do. You don't do it at a
> busy gas station. You follow them. You find some way to stop them, or you wait
> until they stop in a dark area, and then you carjack. That way you get the car. The
> keys are in the car. You don't have to do it at a gas station with all the lighting, with
> all these people around. This is a type of blatant, bold killing that has become all too
> familiar recently. . . .
>
> Now, why do you think this all came to be? I don't know. I don't know who
> wanted to kill Mr. Bey, but they had a motive, and they were there for a reason, and
> they killed him for a reason, and they wanted something out of that car.
>
> Now, if you're going to do a carjacking gone bad, you don't carjack the head of
> the Black Muslim. You don't do it. That's like carjacking a Tony Soprano in New
> Jersey. Your life expectancy would probably be 24 hours, so you don't carjack a
> Muslim. The plate was "Dr. Bey." Everybody knows that car. You don't carjack
> that car. There's plenty of nice cars with 22's around that you can carjack. You
> don't carjack that car.
>
> This is not about a carjacking gone bad. This is about an intentional killing,
> someone with inside information that knew where he would be at that time of the day,
> and exactly where he would be. It might even have been someone on the other end of
> the telephone talking to someone else about where he is, and where's he's going, and
> that's why that getaway car knew where to be.

8RT 1530-1532.

39

1     In her rebuttal, the prosecutor argued that petitioner's claim that this was an assassination

2    was based on speculation and was not supported by the evidence.  She asked the jury not

3    speculate and to base its decision on the evidence.  8RT 1538.

> 4     And for the better part of two hours yesterday, that's exactly what Mr. Ulfelder
> 5   told you to do.  He basically picked apart the prosecution witnesses, and then at the
>     end of his closing argument, he basically told you to throw out all of their testimony.
>     Just throw it out of the window.  Disregard all the facts you learned during the course
> 6   of this trial.  All of those witnesses who testified.  He basically told you to disregard
>     them for whatever reasons, and he gave you those reasons, and I'll go through why
> 7   those reasons are not reasonable in just a minute.
>
> 8     But at the end of his closing argument, he gave you an explanation for why
>     Antar Bey was murdered.  An explanation that is really not accurate.  What it was a
> 9   fun little conspiracy theory that was completely unsupported by any of the facts that
>     you heard in this trial.  There was not a shred of evidence to support anything that Mr.
> 10  Ulfelder told you during the last 15 minutes of his closing argument, not a shred of
>     evidence.  He was asking you to speculate.  And you cannot, and you must not do that.
> 11
> 12    And why?  Why did he do that?  Well it's an attempt to mislead you.  It's an
>     attempt to mislead you.  And that's – that's a good example of insulting your
> 13  intelligence, really.
>
> 14    And why did he do that?  Why did he want to mislead you?  Because he
>     couldn't stand up in his closing argument and say, "You know what?  Ms. McMahon
> 15  proved her case beyond a reasonable doubt.  There is a mountain of evidence piled
>     high on top of my client."  Because there is, but he can't stand up there and you that.
> 16  He doesn't have a defense.  And while I've seen it time and time again, and that's
>     what happens when you don't have a defense, you pick apart the prosecution
> 17  witnesses, and then you come up with some speculative idea as to why all this
>     happened.

18   8RT 1538-1539.

19    Petitioner argued that the prosecution committed misconduct by arguing that petitioner's

20   theory of the offense was based on pure speculation.  There was nothing improper about the

21   prosecutor's rebuttal argument.

22    As stated earlier, habeas relief is warranted only if the prosecutor's comments in closing

23   argument "so infected the trial with unfairness as to make the resulting conviction a denial of due

24   process."  *Darden v. Wainwright,* 477 U.S. at 181; *see Parker v. Matthews,* 132 S.Ct. 2148 (June

25   11, 2012) (per curiam).  Moreover, in determining whether a due process violation occurred,

26   "arguments of counsel generally carry less weight with a jury than do instructions from the

27   court."  *Boyde v. California*, 494 U.S. 370, 384 (1990); *accord Ortiz-Sandoval v. Gomez,* 81 F.3d

28   891, 898 (9th Cir. 1996) ("The arguments of counsel are generally accorded less weight by the

40

1  jury than the court's instructions and must be judged in the context of the entire argument and the

2  instructions.").

3      "The prosecutor's comments must be evaluated in light of the defense argument that

4  preceded it." *Darden v. Wainwright* 477 U.S. at 179. Thus, an argument that is an "invited

5  response" to defense counsel's remarks does not prejudice the jury. *United States v. Young*, 470

6  U.S. 1, 11-13 (1985); *United States v. Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996).

7      "Prosecutors must have reasonable latitude to fashion closing argument, and thus can argue

8  reasonable inferences based on the evidence." *United States v. Necoechea*, 986 F.3d 1273, 1276

9  (9th Cir. 1993). "The prosecutor may argue reasonable inferences from the evidence presented,

10  which is precisely what he did here." *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005).

11  A prosecutor may comment on a defendant's failure to produce material evidence or to call

12  logical witnesses. *United States v. Robinson*, 485 U.S. 25, 26-34 (1988); *United States v. Garcia-*

13  *Guizar*, 160 F.3d 511, 521-522 (9th Cir. 1998); *United States v. Lopez-Alverez*, 970 F.3d 583,

14  595-596 (9th Cir. 1992) ("a prosecutor may properly comment upon the defendant's failure to

15  present exculpatory evidence, as long as it is not phrased to call attention to defendant's own

16  failure to testify," citations omitted).

17      In the instant case, the prosecutor was merely commenting on the lack of evidence to

18  support the defense theory of the case. She properly argued that the theory was based on pure

19  speculation and there was no evidence to support such a theory. The argument constituted fair

20  comment on the evidence and there was no miscarriage of justice. As previously discussed in

21  Argument I, the trial court here properly excluded purported third-party culpability evidence in

22  this case. Respondent incorporates that discussion here. The evidence offered by petitioner does

23  not tend to show that Antar Bey was murdered by a Black Muslim rival. The prosecutor properly

24  argued that there was no evidence to support petitioner's theory.

25      The state appellate court reasonably correctly held that no misconduct occurred. This

26  conclusion was not contrary to or involved an unreasonable application of, clearly established

27  federal law, as determined by the United States Supreme Court. In any event, the prosecution's

28

1   actions certainly did not have a substantial and injurious effect or influence on the jury's verdict.

2   *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995).

3   **VII.   THERE WAS NO PREJUDICIAL ERROR**

4        Petitioner argues the California Court of Appeal erred in determining there was no

5   cumulative error.  In fact, the state appellate court found that because the trial court's rulings were

6   proper, there was no need to consider whether the judgment should be reversed because of the

7   cumulative effect of the claimed errors.  Exh. 2, p. 23, n.18.  Similarly, respondent submits that

8   because there was no violation of federal rights in connection with petitioner's trial, there is no

9   reason to reverse due to cumulative error.  *Hayes v. Ayers,* 632 F.3d 500, 524 (9th Cir. 2011);

10  *Boyde v. Brown,* 404 F.3d 1159, 1176 (9th Cir. 2005); *Fuller v. Roe,* 182 F.3d 699, 704 (9th Cir.

11  1999) revd on other grounds, *Slack v. McDaniel,* 529 U.S. 472, 482 (2002); *Rupe v. Wood,* 93

12  F.3d 1434 1445 (9th Cir. 1996).

13  **CONCLUSION**

14       Accordingly, for the reasons specified, respondent respectfully requests the petition for writ

15  of habeas corpus be denied.

16  Dated:  July 9, 2012               Respectfully Submitted,

17                           KAMALA D. HARRIS
                         Attorney General of California

18                           PEGGY S. RUFFRA
                         Supervising Deputy Attorney General

19

20

21                           /s/ Christopher J. Wei

22                           CHRISTOPHER J. WEI
                         Deputy Attorney General

23                           *Attorneys for Respondent*

24  SF2012401513
   20619976.doc

25

26

27

28

42