1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   ALFONZA A. PHILLIPS,                      Case No.  11-cv-04707-JST (PR)

            Petitioner,
8                                             **ORDER DENYING PETITION FOR**
        v.                                    **WRIT OF HABEAS CORPUS;**
9                                             **DENYING CERTIFICATE OF**
    P.D. BRAZELTON, Warden,                   **APPEALABILITY**
10
            Respondent.
11

12

13          Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to

14   28 U.S.C. § 2254 by petitioner Alfonza Phillips, challenging the validity of a judgment obtained

15   against him in state court.  Respondent filed an answer to the petition.[1]  Petitioner has not filed a

16   traverse, and the time in which to do so has passed.

17                                I.  PROCEDURAL HISTORY

18          On November 15 and 19, 2007 an Alameda County jury found petitioner guilty of first

19   degree murder (Cal Penal Code § 187(a)[2]), attempted carjacking  (§ 215(a)), and possession of a

20   firearm by a felon (§ 12021(a)(1)) (repealed Jan. 1, 2012).  (Ex. 1 at 480-82, 531-33.[3])  The jury

21   found true that petitioner personally used a firearm in the commission of the offense

22   _____

23   [1] Petitioner initially named Connie Gipson, warden of California State Prison – Corcoran, as the
     respondent in this action.  The California Department of Corrections online inmate locator service
24   confirms that petitioner has been transferred to Pleasant Valley State Prison ("PVSP").  Pursuant
     to Rule 25(d) of the Federal Rules of Civil Procedure, P.D. Brazelton, the current warden of
25   PVSP, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.  Petitioner
     is reminded that he must keep the Court and all parties informed of any change of address.
26
     [2] Except as otherwise specified, all statutory references herein are to the California Penal Code.
27
     [3] All references herein to exhibits are to the exhibits submitted by respondent in support of the
28   answer.

United States District Court
Northern District of California

1   (§ 12022.53(d)) and that the murder was committed during the commission of a carjacking

2   (§ 190.2(a)(17)(L)).  (Id.)  On December 14, 2007, the trial court sentenced petitioner to life

3   imprisonment without the possibility of parole.  (Ex. 1 at 538-42.)

4        Petitioner directly appealed the judgment in the California Court of Appeal.  On April 29,

5   2010, in a reasoned opinion, the California Court of Appeal affirmed the judgment.  (Ex. 2.)  On

6   August 18, 2010, the California Supreme Court summarily denied the petition for review.  (Ex. 6.)

7   Petitioner did not pursue habeas relief in state court.  The instant petition was filed on September

8   21, 2011.

9                              **II.  STATEMENT OF FACTS**

10       The following background facts describing the crime and evidence presented at trial are

11  from the opinion of the California Court of Appeal.[4]:

12       **A. The Killing**

13  At approximately 7:30 on the evening of October 25, 2005, Antar Bey[5] drove his BMW to

14  a gas station on Martin Luther King Jr. Way, in Oakland.  The license plate of the car was

15  " 'Dr. Bey.' "[6]  The car had expensive 22-inch rims on the wheels.

16  Bey went into the gas station's store to pay, then went back outside.  The cashier, Dung

17  Nguyen, heard a bang and saw a flash, looked outside, and saw people "scattering away."

    He saw an African-American male get into the BMW from the driver's side, stay there for

18  a couple of seconds, and then get out of the car and run away.[7]  Nguyen went outside and

19  _____

    [4] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir.

20  2002); 28 U.S.C. § 2254(e)(1).

21  [5]

22          Where we refer to a person as simply Bey, the reference is to Antar
            Bey.  Other members of the Bey family will be referred to by their
            first and last names.

23  [6]

24          There was evidence that Bey was associated with a business known
            as " 'Your Black Muslim Bakery,' " and that he was the son of Dr.
25          Yusef Bey.

26  [7]

27          Nguyen was unable to identify [petitioner] at trial as the person who
            was near Bey's car.  He described the person he saw as being in his
            late teens, five feet five inches to five feet eight inches in height,
            approximately 130 to 150 pounds, and wearing black clothing.
28          [Petitioner] was 20 years old at the time of his arrest, was five feet

United States District Court
Northern District of California

1   saw Bey lying face down in the parking lot.  He had blood on him and appeared to have
2   been shot.  Nguyen called 911, then stayed with Bey until paramedics arrived.

3   A passing motorist, Daryl Flood, was stopped on Martin Luther King Jr. Way in the
    middle of three southbound lanes at a traffic light on the corner next to the gas station.[8]  He
4   noticed the BMW, which was a "really nice looking car" with big rims, and saw two men
    standing at the rear of the car.  One of them appeared to "ha[ve] a gun on the other man."
5   Flood identified the gunman as [petitioner].[9]  The other man appeared to be using his cell
    phone.  Flood turned to tell his passengers what was happening, then heard the gun being
6   fired and saw the other man stumble and fall.  [Petitioner] ran to the car, jumped into it
    from the driver's side door, moved around inside the car, then after about a minute got out
7   of the car and "took off running."  At first it appeared to Flood that [petitioner] was
    running toward him, and he put his vehicle in reverse so he could get away.  However,
8   [petitioner] instead ran away down the cross street, 55th Street.  Flood pulled over to the
    gas station and attended to the victim, Bey, who was lying face down on the ground.
9

10   The key to Bey's car and a cell phone were on the ground near Bey.

11   Bey died of a gunshot wound to his back.

12   **B. The Investigation**

13   Officer Jose Vasquez of the Oakland Police Department received a call about the shooting,
    and went to the scene.  As he and other officers were investigating the matter, a group of
14   approximately 10 young African-American men approached, wanting to go inside the
    taped-off area of the crime scene.  They appeared to the lead investigator on the case,
15   Sergeant Robert Nolan, to be "Muslims," and identified themselves as such.

16
    A partial fingerprint was recovered from the exterior of Bey's car, in a position that was
17   consistent with someone opening or closing the driver's door.  The print represented about
    10 percent of a full fingerprint.  Vincent Deitchman, a criminalist at the Oakland Police
18   Department, concluded that the print was that of [petitioner]'s left middle finger.  He found
    eight points of similarity between the print found on Bey's car and [petitioner]'s known
19   fingerprint; a second examiner found nine and likewise concluded the print was
    [petitioner]'s.[10]  Deitchman also had a computer compare the partial fingerprint to a
20

21
_____

22   seven inches tall, and weighed 145 pounds.

    [8]
23
    Evidence presented by [petitioner] showed that the distance between
24   Flood and the killing was 154 feet.

25   [9]
    Flood recognized [petitioner] by his face when he testified at the
26   preliminary hearing in September 2006.  He had seen [petitioner] in
    shackles on an earlier day of the hearing.  At the time of the
27   shooting, it was starting to get dark, but the area was well lit.

28   [10]
    Eight points of similarity was the minimum number Deitchman had

United States District Court
Northern District of California

database containing prints from all people arrested in Alameda and Contra Costa Counties, including [petitioner]. The computer provided 10 possible matches. [Petitioner]'s fingerprints were not among them. However, Deitchman testified that, particularly when searching for a match of a print containing limited detail, it was not unusual to fail to find the true match. Deitchman did not recall comparing the recovered fingerprint to the 10 candidates.

A bullet was recovered from Bey's body. It could have come from a Smith & Wesson Model 29 .44 magnum revolver or a Taurus .44 special caliber revolver.

Nolan was aware that Bey was associated with Your Black Muslim Bakery, and knew that other shootings and murders had been connected to the bakery.[11] However, as the evidence against [petitioner] mounted, Nolan ruled out the possibility that a family member or someone else connected with the bakery had killed Bey. He also reviewed a gas station security videotape of the incident, which led him to believe that the incident was a street robbery.

## C. [Petitioner]'s Statements

### 1. Dwayne Johnson's Evidence

Dwayne Johnson, the stepfather of [petitioner]'s girlfriend, Althea Foy, testified at trial. [Petitioner] often spent the night with Foy at the home she shared with her mother and stepfather. At the beginning of [petitioner]'s relationship with Foy, he and Johnson got along well. On four or five occasions, Johnson had seen [petitioner] with a .44 magnum revolver in his waistband.

After the killing, [petitioner] told Johnson that he had shot Bey with a .44 magnum because he wanted the 22-inch rims on Bey's car in order to impress Foy, and that after shooting Bey, he got into the car, found there were no keys, and ran away. Johnson testified that Foy also told him that [petitioner] had killed Bey, that the killing was "a carjacking gone bad," that [petitioner] had been trying to get the rims for her, that he had shot Bey in the back, and that he had panicked.

Two days after the killing, [petitioner] and Johnson had a fight over the proceeds of the sale of some Ecstasy pills. According to Johnson, he gave [petitioner] the pills to sell, and [petitioner] refused to give him money in return. Johnson hit [petitioner] a couple of times and [petitioner] ran away as Johnson "really tr[ied] to get to him." Johnson testified that he wanted to beat [petitioner] and that he "would have made him wish he was dead."

---

used to make an identification.

[11]

The trial court refused to allow [petitioner] to cross-examine Nolan about what he knew about shootings and murders associated with Your Black Muslim Bakery.

The following day, Johnson called Officer Marcus Midyett of the Oakland Police Department, then spoke with two homicide investigators, Nolan and Sergeant Derwin Longmire.[12]  He told the police that [petitioner] had told him on the previous day that he had killed "the Muslim."

Approximately a month after he first spoke with the police, Johnson gave them some .44 magnum bullets or shell casings that he had found in clothing [petitioner] had left in his house.

At the time of trial, Johnson was in jail after being charged with having committed four robberies approximately six months previously.  He faced a three strikes allegation.  He had been committing crimes since he was approximately 14 years old, and had been convicted of "[r]obbery, burglary, grand theft, a few misdemeanor charges, a dope charge."  He had been a drug addict since he was about 18 years old, and used heroin and crack cocaine.  He supported his drug habit by stealing and robbing.

Johnson had been promised his testimony would not be used against him in the pending robbery case, but the prosecutor had not given him a deal with respect to the robbery case.[13]  However, he acknowledged that he expected some consideration for his testimony, noting that he was facing a possible sentence of 25 years to life.  He had testified in a murder trial about four years previously, and as a result had received $1,000 from a program known as " 'Crime Stoppers.' "  He considered himself an informant for the Oakland Police Department, and regularly spoke with one officer in particular, Midyett.  Johnson sometimes received money for the information he provided.  When he provided the information about [petitioner]'s statements, he expected to receive money for it, and in fact received $1,000 from " 'Crime Stoppers' " for the information.

### 2. Althea Foy's Evidence

Foy testified that she and [petitioner] had been dating for about three weeks before the killing.  According to Foy, [petitioner] did not admit to her that he had killed Bey.  She denied having told Johnson [petitioner] had robbed or killed Bey or that he wanted to get her 22-inch rims for her car.

On November 8, 2005, two weeks after the killing, [petitioner] was riding with Foy in her car, wearing a dreadlock wig.  Police officers pulled the car over, and [petitioner] was

---

[12]

       Johnson testified that he met with Longmire and another officer, whom he thought was Nolan. Nolan testified that he met with Johnson on October 28, 2005.

[13]

       At trial, he admitted having committed the robberies with which he had been charged.

arrested.[14]  Foy was taken to the police station, where she was interviewed by Nolan and Longmire.

Foy testified that Nolan and Longmire treated her "[v]ery badly" in the interview room, that they threatened her and her family, and that they ignored her request for an attorney. According to Foy, Longmire "said that he haven't slapped a young Black bitch in a long time.  I'm lucky I still have my teeth in my mouth."  She testified that one of the detectives, apparently Longmire, told her that if she did not cooperate and give him a statement, he "would have to tell the Muslims who was arrested with him, and they would come after me and my family."  Longmire told her that the Muslims believe in "an eye-for-an-eye," which she understood to mean "You kill one of theirs, they'll kill one of yours."  He said that if she did not give a statement, then he would tell the Bey family that she had been with [petitioner] when he was arrested, and that they would kill her and her family.  According to Foy, Longmire threatened to have her charged with harboring a fugitive, unless she cooperated with them, and Nolan showed her an enlarged photograph of a jealous and violent former boyfriend, who was in prison, and threatened to tell him she was involved with [petitioner].  These portions of the interview were not recorded.  Foy testified she was frightened, crying, and shaking.

Foy made a tape-recorded statement at the end of the interview.  She told the officers that [petitioner] had told her he had killed Bey in a "carjacking went bad," that she had asked him repeatedly about his involvement after hearing rumors, and that she had told her mother [petitioner] might have had something to do with the killing.  She said that earlier in the interview, she had been dishonest with the officers because she was nervous.

At trial, Foy testified that she made the recorded statements implicating [petitioner] in Bey's death only after being threatened.  According to Foy, "After me and my family was threatened, I told him everything he wanted to hear, or I told him everything I thought he wanted to hear."

In a telephone call from jail, which [petitioner] acknowledges took place between himself and Foy, [petitioner] and Foy expressed their wish for him to be released from jail, and [petitioner] told Foy, "Stay silent."

### 3. Longmire's and Nolan's Testimony

Longmire testified that Nolan had primary responsibility for investigating the killing of Bey, and that he was the secondary officer on the case.  He denied having threatened Foy during the unrecorded portion of their interview, denied that Foy was shown a picture of a former boyfriend, denied that she had asked for an attorney, and testified that while she

---

[14]

> One of the officers who was present testified that he told Foy she was under arrest for harboring a fugitive. He did not give her a *Miranda* warning. When he was arrested, [petitioner] was wearing a jacket that appeared similar to the one worn by the gunman, and had no weapons on him.

United States District Court
Northern District of California

appeared "shaken," she did not seem to be afraid of Longmire or Nolan.  Nolan likewise denied that either he or Longmire threatened Foy.

People v. Phillips, No. A120183, 2010 WL 1712905, *1-4 (Cal. Ct. App. Apr. 29, 2010).

## III.  DISCUSSION

A.     Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed the claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.     Petitioner's Claims

As grounds for habeas relief, petitioner claims that: (1) the trial court erred in excluding evidence of third party culpability; (2) the trial court erred in admitting unduly suggestive and unreliable identification evidence; (3) the trial court erred in excluding crime scene evidence; (4) the trial court erred in excluding evidence of a witness's bias; (5) the trial court erred in excluding evidence of an investigating officer's bias; (6) the prosecutor committed misconduct; and (7) cumulative error denied him a fair trial.  The Court addresses each claim in turn.

1.     Exclusion of Evidence – Third Party Culpability

Petitioner claims that the trial court violated his right to present a defense and to confront witnesses when it prevented him from introducing evidence of third party culpability.  (Petition at 6.)  According to petitioner, there was a war within the Black Muslim organization for control of the Black Muslim Bakery and this provided a motive for Bey's murder.

a.     Background

The Court of Appeal considered and rejected this claim as follows:

*1. Motion in Trial Court*

United States District Court
Northern District of California

[Petitioner] moved to admit evidence of third party culpability.  His theory was that "ever since Antar [Bey] took over as CEO of the bakery from Waajid [sic] Aljawwaad, who was murdered in February 2004, there has been a rift in the Bey family" and that one faction believed Bey was responsible for Aljawwaad's killing and an attempted assassination of John Bey, while the other faction supported Bey.  Thus, there was an ongoing power struggle for control of the bakery and Bey had received threats and had been shot at in his home within a month of his killing, once when his wife Joshaya Joshua was at home and another time when she was absent.

Specifically, "to rebut the carjacking count and special allegation" [petitioner] made the following offer of proof: "Mr. Phillips would present evidence that the killing was not a random carjacking by a stranger, but an assassination of Antar Bey by his enemies within the Black Muslim organization for control of the bakery business or retaliation for the killing of Waajeed Aljawweed [sic] or for the attempted murder of John Bey.  The evidence to be presented would show that John Bey told the Oakland Police Department shortly after Waajeed Aljawwaad's killing that he thought Antar Bey was responsible for the killing.  In June of 2005, John Bey was shotgunned in front of his home and escaped with his life.  Oakland Police Department has publicly stated that they believe the John Bey attempted murder was a Black Muslim hit.  John Bey moved out of the Oakland area out of fear for his life.  The proffered evidence from Joshaya Joshua [Antar Bey's widow] would show that Antar Bey's violent Muslim enemies tried to kill him twice within a month of his killing, that he received death threats shortly before his killing and that there was a power struggle within the Black Muslim organization for control of the bakery.  All of the evidence of third party culpability is offered to rebut the carjacking allegations not to portray Antar Bey as a violent thug and murderer."

In a motion to exclude this same evidence, the district attorney countered defense counsel's recital of the facts, indicating that "[i]n the months prior to Antar's murder, Antar supposedly received death threats and shots were fired into his house.  However, no formal report regarding those incidents was ever made to OPD.  Moreover, this information only surfaced after Antar's murder when Amarreh Bey (a.k.a. Joshaya Joshua), Antar's wife, spoke with Sergeants Nolan and Longmire.  Amarreh never told Nolan or Longmire who was responsible for the threats or shooting."

At the hearing on these motions, the judge inquired in detail with respect to [petitioner]'s offer of proof.  In the course of this inquiry, defense counsel conceded that John Bey's statement – that he believed Antar Bey was responsible for killing Waajeed – was only an opinion.  Counsel further conceded that other asserted facts – the shotgun assault on John Bey believed to be by members of the Your Black Muslim Bakery causing him to move out of Oakland in fear of his life – were relevant only to prove there was a "violent power struggle [going on] between ... two factions, the John Bey and Farida Bey faction versus the Antar Bey faction...."  Defense counsel did not indicate how he intended to introduce these foundational facts into evidence.

Defense counsel also clarified that Joshua's proffered testimony was gleaned from the notes of an interview by Nolan and Longmire, not from his own discussions with Joshua; although he had spoken with her twice, she "did not discuss the details of her statement to the police."  Counsel stated that the interview notes were "not exactly absolutely crystal

9

clear," but they did "make clear that she felt that Elijah Bey would kill Antar Bey to take control of the bakery, and she also said that Joshua Bey, Junior, also wanted the bakery and had a motive to kill Antar Bey.  That is what's in the notes."  Counsel's offer of proof that Joshua would testify Antar Bey received death threats shortly before his killing was also "[t]he best that [counsel] could glean from the notes...."  The court then asked counsel: "But as of right now, ... you have no information that would show that it's anything more than a conclusion on [Joshua's] part, or hearsay that she's passing on...."  Counsel replied: "That's correct, your honor."  Defense counsel offered to produce Nolan and Longmire for questioning, but never requested that Joshua be permitted to testify at an evidentiary hearing.

The trial court denied [petitioner]'s motion, concluding that almost all of the proffered evidence was inadmissible hearsay or opinion evidence, and there was an insufficient link between the admissible evidence – that someone had fired shots into Bey's home – and the killing.  [Petitioner] contends the trial court thereby deprived him of the opportunity to present a defense and confront the witnesses against him.

### 2. The Trial Court's Ruling Was Not an Abuse of Discretion

 . . .

We agree with the trial court's conclusion that almost all of the proffered evidence was inadmissible hearsay or opinion.  [Citation.]  [Petitioner] made no offer of proof that John Bey would testify either to having been shot at in front of his home or to the basis of his alleged statements to the police department that he believed Bey was responsible for Aljawwaad's killing.  [Petitioner] did not indicate he intended to call any witness associated with the Bey family other than Joshua.  Nothing in Joshua's alleged statements to Nolan and Longmire, as clarified by defense counsel, indicated that she personally had heard any threats against Bey or that she had heard any members of the Bey family say they wanted control of the bakery.  The only nonhearsay testimony it appears she would have given is the evidence that one or more shots were fired at their home while she was present.

[Petitioner] contends that some of the evidence, including John Bey's alleged statement to the police, was admissible for the nonhearsay purpose of showing the declarant's state of mind: i.e., it showed that members of a rival Black Muslim faction intended to assassinate Bey and then acted in conformity with that intent.  [Citation.]  We reject this contention.  Nothing in John Bey's alleged statement indicated he intended to seek revenge against Bey and, as we have discussed, there is no indication that Joshua herself heard the other statements at issue.

As we have explained, evidence of another person's motive or opportunity to commit a crime is not admissible to show third party culpability unless there is " 'direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' "  [Citation.]  Evidence that an unknown person had fired shots into Bey's home would not establish that a third person had later actually killed him at the gas station, then got briefly into his car, before running away.  Nor would it provide a nonspeculative basis to conclude that [petitioner] killed Bey on behalf of a rival faction connected with the bakery, rather than doing so in the course of a carjacking.  [Petitioner] failed to make an adequate offer of

proof that he possessed admissible evidence demonstrating either that he was not committing a carjacking when he killed Bey or that someone else was the killer. [Citation.]  The trial court did not abuse its discretion in excluding the proffered evidence.

Phillips, 2010 WL 1712905 at *4-7 (footnotes omitted).

    b. <u>Analysis</u>

      i. <u>Due Process</u>

  A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process.  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999); <u>Jammal</u>, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated.  <u>Perry v. Rushen</u>, 713 F.2d 1447, 1453 (9th Cir. 1983).

  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (citations omitted); <u>see also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence).  "[T]he introduction of relevant evidence can be limited by the State for a valid reason."  <u>Id.</u> at 53 (internal quotes and citation omitted).  But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  <u>Holmes</u>, 547 U.S. at 324.  Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense.  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973).  "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  <u>Nevada v. Jackson</u>, 133 S. Ct. 1990, 1992 (2013).

  The California Court of Appeal's determination that the proffered third party evidence was not relevant to the crime at issue was not contrary to, or an unreasonable application of, clearly

United States District Court
Northern District of California

established federal law.  See 28 U.S.C. § 2254(d).  Rather, the Court of Appeal reasonably

concluded that there was no direct or circumstantial evidence linking another person to the actual

perpetration of Bey's murder.  The evidence did not establish any link between the alleged power

struggle over the Black Muslim Bakery and the homicide.  Petitioner could not even identify a

third party culprit.  (Ex. 7 at 147-63.)  Indeed there was no evidence of who was responsible for

the June 2005 shooting of John Bey, let alone evidence that such perpetrator was connected to

Antar Bey.  (Id. at 153-54.)  Petitioner's suggestion that Antar Bey's killing was an act of

retaliation for the June 2005 shooting of John Bey is speculative at best.  It tends only to show a

coincidence that a power struggle involving Bey was occurring at the time Bey was murdered.

Under the circumstances, the decision to exclude the evidence was well within the permissible

scope of discretion and did not render petitioner's trial fundamentally unfair.  See Spivey v. Rocha,

194 F.3d 971, 978 (9th Cir. 1999) (finding that the trial court's exclusion of purely speculative

evidence as to a third party's possible motive for committing the crime did not render the trial

fundamentally unfair).

ii.  Confrontation

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.

The federal confrontation right applies to the states through the Fourteenth Amendment.  Pointer

v. Texas, 380 U.S. 400, 403 (1965).

The Confrontation Clause guarantees an opportunity for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent, the defense might

wish.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Accordingly, "trial judges retain wide

latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such

cross-examination based on concerns about, among other things, harassment, prejudice, confusion

of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  Generally speaking, a court violates the

Confrontation Clause only when it prevents a defendant from examining a particular and relevant

topic.  Fenenbock v. Director of Corrections, 692 F.3d 910, 919 (9th Cir. 2012).  Such limitations

1    are proper as long as the cross-examination is sufficient to allow the jury to evaluate "the biases

2    and motivations of the witness." Evans v. Lewis, 855 F.2d 631, 633-34 (9th Cir. 1988) (citation

3    omitted).

4          Petitioner does not explain how exclusion of the evidence could have violated his

5    Confrontation Clause rights. He does not say that any witness against him was not present at trial

6    and subject to cross-examination. The only potential witnesses through whom the third party

7    culpability evidence could have been introduced were Bey's wife (Joshaya Joshua) and members

8    of the John Bey and Farida Bey Black Muslim factions that were purportedly rivals to Antar Bey.

9    But none of these individuals was a witness against petitioner.

10         The officers who investigated the crime, Nolan and Longmire, testified and were cross-

11   examined at length. (See Ex. 7 at 289-358, 1107-52.) To the extent petitioner claims that the

12   defense should have been allowed to cross-examine them on their notes from an interview with

13   Joshaya Joshua, the claim fails. The Court of Appeal found that the notes were inadmissible

14   hearsay or opinion evidence under California law. The appellate court's finding in that regard is

15   binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held

16   that a state court's interpretation of state law, including one announced on direct appeal of the

17   challenged conviction, binds a federal court sitting in habeas corpus").

18         Even if the excluded evidence in question gave rise to a potential violation of the

19   Confrontation Clause, petitioner's claim would still fail because such claims are subject to

20   harmless error analysis. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004). For

21   purposes of federal habeas corpus review, the standard applicable to violations of the

22   Confrontation Clause is whether the allegedly inadmissible evidence had " 'substantial and

23   injurious effect or influence in determining the jury's verdict.' " See Hernandez v. Small, 282 F.3d

24   1132, 1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v.

25   Lewis, 44 F.3d 1387, 1393 (9th Cir. 1994) (same).

26         In light of the abundant evidence implicating petitioner in the victim's murder, the

27   exclusion of the third party culpability evidence cannot be considered prejudicial. Petitioner

28   confessed to Johnson that he shot and killed Bey. (Ex. 7 at 736-37, 745-47.) Althea Foy also told

United States District Court
Northern District of California

Johnson that petitioner killed the victim.  (Id. at 749.)  She said the same to police.  (Id. at 240-43.)

Daryl Flood identified petitioner as the assailant.  (Id. at 1073-88.)  Petitioner's fingerprint was

found on Bey's BMW.  (Id. at 585-86.)  The .44 caliber cartridges taken from petitioner's pockets

were the same caliber found in Bey's body.  (Id. at 802-03, 1128.)  Finally, petitioner had a motive

to kill Bey: this was a "carjacking gone bad" when petitioner tried to take the 22-inch rims from

Bey's car.  (Id. at 753.)  Consequently, in light of the overwhelming evidence against petitioner,

any error in excluding the third party culpability evidence was harmless under Brecht.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.        Admission of Identification Evidence

Petitioner claims the trial court violated his due process rights and his right to effective

assistance of counsel by admitting evidence of Daryl Flood's identification of petitioner as the

gunman.  (Petition at 6.)

a.        Background

The Court of Appeal considered and rejected this claim as follows:

[Petitioner] contends the trial court erred in denying his motion to suppress any in-court identification of [petitioner] by Flood at trial or testimony that Flood had identified [petitioner] as the gunman at the preliminary hearing.

At the preliminary hearing, Flood was asked whether he recognized anyone in court.  He identified [petitioner] as the person who shot Bey, and said he was "pretty certain" and "[a]bout 90% sure" of his identification.  At the hearing on the motion to suppress the identification, Gregory Dolge, the deputy district attorney who handled the preliminary hearing, testified that [petitioner] was shackled and in jail clothes at the time Flood identified him, and a deputy sheriff had escorted him to defense counsel.  Flood had been present at an earlier court date for the preliminary hearing, at which [petitioner] likewise appeared shackled and in jail clothes and was escorted to the defense table.

Before the preliminary hearing, Flood had not told Dolge he would be able to identify [petitioner], and had not been asked to make an identification from a photographic or physical lineup.  [Petitioner] had not requested a lineup before Flood testified, and did not ask to have Flood excluded from the courtroom until he was ready to testify.  Dolge testified that he may have told Flood in advance that he might ask whether he recognized anyone; however, he did not expect Flood to be able to make an identification, in part because of the passage of time, and was surprised when he did so.  He did not advise defense counsel in advance that he might ask Flood whether he could identify anyone.  The trial court denied [petitioner]'s request to suppress the identification.

At trial, Flood again identified [petitioner] as the gunman he saw, saying he was "positively sure" of the identification, and that he knew [petitioner] was the person he saw on the evening in question.  On cross-examination, defense counsel elicited testimony that Flood had seen [petitioner] at both preliminary hearing dates, that [petitioner] had been shackled at the time, and that at the time Flood knew [petitioner] was a suspect in the case.

[Petitioner] contends that the identification procedure was unduly suggestive and unreliable, and that in admitting the identification, the court violated his constitutional rights to effective assistance of counsel and due process.

" 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation].  If, and only if, the answer to the first question is yes and the answer to the second question is no, is the identification constitutionally unreliable.' " [Citations.] …

At the preliminary hearing, Flood testified that nothing obstructed his view of the gunman and the victim, that he looked directly at the gunman and the victim, that he saw the gunman's entire face, and that he did not take his eyes off the scene.  He described the gunman as an African-American man, about five feet seven or eight inches, in his early 20's, a description that matched [petitioner].  He was about 90 percent certain of his identification.  We recognize that Flood also testified that he did not focus specifically on the gunman's face, but instead on "the whole incident"; that he said, apparently inaccurately, that the gunman had a hoodie or beanie cap on his head; and that nearly 11 months had passed between the shooting and the preliminary hearing.  However, we conclude that the trial court did not err in finding the identification reliable under the totality of the circumstances.

As [petitioner] points out, Flood identified him not in a lineup, but in court, when he was in jail clothes and shackled, in circumstances where Flood knew he had been accused of killing Bey.  However, as stated by our Supreme Court in *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155, "[i]nsofar as [a] [petitioner] contends that an in-court identification not preceded by a lineup is impermissibly suggestive and prejudicial as a matter of law, he is wrong."  The court rejected the defendant's contention that once a witness had made his in-court identification of the defendant, there was no effective way to ameliorate its impact, stating, "[t]o the contrary, it has long been recognized that '[i]n the case of in-court identifications not preceded by a lineup ..., the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury....' [Citations.]"  (*Ibid.*)  "[A]n identification made in front of the jury carries with it the circumstances under which it was made, which, in turn, can be argued to and weighed by the jurors."  [Citation.]

The same is true here.  The jury was aware that Flood had seen the gunman's face only briefly, and that when he identified [petitioner] at the preliminary hearing, [petitioner] was shackled and sitting at the defense table, and he knew [petitioner] was a suspect in the case.  The jury also knew that Flood had not viewed either a photographic or a physical lineup

before the preliminary hearing.  Defense counsel dwelt extensively on the weaknesses in Flood's identification of [petitioner] during his closing argument.  In the circumstances, we reject [petitioner]'s contentions that the lineup was impermissibly suggestive, unreliable, and prejudicial, and that admission of the identification evidence deprived him of his constitutional rights.

Phillips, 2010 WL 1712905 at *7-9 (footnotes omitted).

        b.    Analysis

              i.  Due Process

Due process may require suppression of eyewitness identification evidence where the identification procedure used was suggestive and unnecessary.  Perry v. New Hampshire, 132 S. Ct. 716, 718 (2012); Manson v. Brathwaite, 432 U.S. 98, 107-09 (1977); Neil v. Biggers, 409 U.S. 188, 196-98 (1972).  However, improper state conduct in arranging unnecessarily suggestive pretrial identification procedures alone does not require exclusion of in-court identification testimony; the reliability of the eyewitness testimony is the "linchpin" in determining its admissibility.  Manson, 432 U.S. at 100-14; see United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008).  Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).

A reviewing court may assume suggestiveness and review reliability first.  Id. at 1339.  An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification.  United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).  In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness's opportunity to view the defendant at the time of the incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. Manson, 432 U.S. at 114.

Here, the Court will assume without finding that Flood's identification of petitioner at the

preliminary hearing occurred under unduly suggestive conditions.  <u>Van Pilon</u>, 799 F.2d at 1339.

Even assuming suggestiveness, however, there were many indicia of the reliability of Flood's

identification.  Flood testified at the preliminary hearing that he looked directly at the two men –

the victim and the assailant – at the gas station.  (Ex. 1 at 29.)  He could see petitioner's entire face.

(<u>Id.</u> at 24.)  Flood did not take his eyes off the scene.  (<u>Id.</u> at 29.)  He was able to describe the

assailant and the assailant's clothing.  (<u>Id.</u> at 25-26.)  In his identification of petitioner at the

preliminary examination, Flood testified that he recognized petitioner from seeing him at the gas

station and got a good look at him.  (<u>Id.</u> at 34.)  Flood was 90 percent sure of his identification of

petitioner.  (<u>Id.</u> at 35.)  Flood testified that he attributed the 10 percent uncertainty to the fact that

he could not see the assailant's hair during the shooting.  (<u>Id.</u> at 36.)

At trial, Flood testified that he had 20/20 vision and that there were no obstacles blocking

his view of the scene.  (Ex. 7 at 1044-45, 1082.)  Flood observed the assailant running toward

Flood's van before heading toward 55th and Market.  (<u>Id.</u> at 1028.)  He again gave a description of

the assailant matching petitioner.  (<u>Id.</u> at 1029.)  Flood also testified that he saw the assailant's face

and recognized petitioner's face as the assailant when he saw petitioner in court.  (<u>Id.</u> at 1086.)  He

denied that his identification resulted from seeing petitioner in jail clothing.  (<u>Id.</u>)  At trial, Flood

was positive of his identification of petitioner as the assailant.  (<u>Id.</u> at 1087-88.)  He testified,

"Well, I'm  not trying to pin anything on this young man.  I know that's the guy that I saw that

night, and I'm here to testify."  (<u>Id.</u> at 1088.)

As noted, by the Court of Appeal, almost 11 months had passed between the shooting and

the identification at the preliminary hearing.  Thus the fifth <u>Manson</u> factor – length of time

between the incident and the identification – weighs in petitioner's favor.  This factor, however, is

heavily outweighed by the other four factors.  Given the indicia of reliability, the Court of

Appeal's denial of this claim was not contrary to or an unreasonable application of federal

authority or an unreasonable determination of the facts.

Further, the reasons discussed above by the Court of Appeal regarding why the

identification was not reliable were brought out on cross-examination.  (Ex. 7 at 1057-70, 1088-

89.)  Finally, as discussed in the previous section, there was other strong evidence pointing to

17

1    petitioner's guilt.  In light of these factors, any error in admitting Flood's identification could not

2    have had a substantial and injurious effect or influence in determining the jury's verdict; it was

3    harmless.

4                                    ii.  Ineffective Assistance of Counsel

5            A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

6    Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of

7    counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth

8    Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such

9    counsel's performance was deficient, i.e., that it fell below an "objective standard of

10   reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, the petitioner must

11   establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a

12   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

13   would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to

14   undermine confidence in the outcome."  Id.

15          Petitioner makes no effort to explain how admission of Flood's identification deprived him

16   of effective assistance of counsel.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir.

17   1984) (holding petitioner must make sufficient factual showing to substantiate ineffective

18   assistance of counsel claim).  On direct appeal, petitioner argued that "defense counsel could and

19   would have requested a non-suggestive line-up if he had any reason to suspect that an in-court

20   identification would be attempted."  (Ex. 3 at 42.)  Assuming petitioner is making the same

21   argument here, and assuming counsel would have requested a "non-suggestive line-up" as

22   petitioner represents, petitioner fails to establish a reasonable probability that the result of the

23   proceedings would have been different.  On the existing record, there would have been no

24   difference because the weight of the evidence is that the identification was reliable.  Petitioner thus

25   fails to establish prejudice.

26          Accordingly, petitioner is not entitled to habeas relief on this claim.

27

28

United States District Court
Northern District of California

18

3.     Exclusion of Evidence – Crime Scene Evidence

Petitioner claims that the trial court violated his right to present a defense and to confront

witnesses when it prevented him from introducing crime scene evidence.  (Petition at 6.)

a.     Background

The Court of Appeal considered and rejected this claim as follows:

[Petitioner] contends the trial court abused its discretion in excluding a videotaped reenactment of the killing, offered to impeach Flood's identification of [petitioner] as the killer by showing he could not have seen the killer clearly enough to identify him.

Donald Bailey, the president and chief executive officer of Pixar Productions Corporation, testified outside the presence of the jury that his company prepared video productions, and that he had experience working in low-light conditions.  To record the reenactment of Bey's killing, he sat in a vehicle in the spot where Flood had been stopped when he saw the killing, used a camera that could be used in normal low-light conditions, and did not use any artificial light other than the lights on his vehicle.  The reenactment took place between 7:00 and 7:30 on October 25, 2007, almost precisely two years after the killing took place. Bailey testified that the recorded reenactment accurately reflected what he saw with the naked eye.  He acknowledged, however, that the images on the screen were smaller than life-size, and that the reduced size would make it harder to see what was happening in the scene.

The trial court refused to admit the videotape, concluding that, largely because the image size was smaller than life, it did not accurately reflect what a person would have seen, and therefore was not relevant because it did not have sufficient tendency to prove or disprove a disputed fact.  The court also refused to allow Bailey to testify before the jury about what he had been able to see during the reenactment of the crime.  After the People and [petitioner] had rested their cases, [petitioner] asked to have the jury view the scene of the crime.  The trial court denied the request, concluding that it would not be possible to duplicate accurately conditions as they existed at the time of the killing.

"It is settled that a trial court has discretion to admit 'experimental' evidence.  The proponent of such evidence bears the burden of production and proof on the question whether such evidence rests upon an adequate foundation. '  Admission of such evidence depends upon proof of the following foundational items: (1)[t]he experiment must be relevant; (2) it must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence; (3) the qualifications of the individual testifying concerning the experimentation must be demonstrated with some particularity; and (4) evidence of the experiment will not consume undue time, confuse the issues, or mislead the jury.' [Citations.]"  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1326.) . . .

The videotape here was offered to show that Flood could not have been able to see the killer well enough to recognize him from the vantage point at which his vehicle was stopped.  The trial court could reasonably conclude that the reduced-sized images visible

on the videotape of the reenactment would not accurately represent what Flood was able to see, and accordingly would not assist the jury in making its determination.  We see no abuse of discretion.

We likewise see no abuse of the trial court's discretion in excluding evidence of Bailey's own observations and refusing to allow the jury to be taken to view the scene of the killing.  (See *People v. Price* (1991) 1 Cal.4th 324, 422 [standard of review for decision to grant or deny request for jury view is abuse of discretion].)  We recognize that in *Price*, the court suggested that the testimony of a witness who had described the scene in question in general terms could have been tested by other means, such as by having an impartial observer view the scene and testify about the ease or difficulty of making an identification under the circumstances.  (*Ibid.*)  There is no suggestion in *Price*, however, that such a procedure is required, and in this case, Flood's identification was thoroughly tested by cross-examination.  Nor can we fault the court's decision not to allow a jury view.  The court could reasonably conclude that the logistical complexities of an evening view, combined with the difficulties of ensuring that the jurors viewed the area under conditions that were sufficiently similar to those on the night of the crime, made such a course of action inappropriate.

Therefore, we conclude the trial court did not abuse its discretion in making the challenged rulings, and reject [petitioner]'s contention that he was thereby deprived of his constitutional rights to confrontation, to present a defense, and to due process of law.

Phillips, 2010 WL 1712905 at *9-11.

> b.  Analysis
>
> i.  Due Process

Applying the legal principles on exclusion of evidence outlined above to petitioner's proffered crime scene evidence, the Court cannot say that the California Court of Appeal's conclusion upholding the trial court's exclusion of the evidence was contrary to, or an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  As stated earlier, a state court's evidentiary ruling is not subject to federal habeas review unless it was so prejudicial as to constitute a violation of due process.  Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

Petitioner has failed to demonstrate an error of constitutional magnitude.  First, Bailey admitted that he never spoke with Flood and never showed the video to Flood.  (Ex. 7 at 1187.)  He did not know if the camera could record at lighting levels similar to an eye's ability to see at

United States District Court
Northern District of California

low light levels and he had no idea whether the actors used in the reenactment were of the same age, height, and weight as the victim and suspect in the case. (Id. at 1188-89.) Bailey also agreed that the monitor displaying the video would reduce everything that was seen (id. at 1195-96), and that the figures on the screen were only 12 to 14 inches tall (id. at 1197). Consequently, the screen did not recreate what Flood could see at his location, and the re-enactment therefore lacked "persuasive assurances of trustworthiness." The same can be said of the trial court's decision not to allow a jury visit to the crime scene. The trustworthiness of any such evidence would be undermined by the difficulties of ensuring that the jurors viewed the area under conditions sufficiently similar to those Flood experienced on the night of the crime.

Finally, this evidence was not critical to the defense because, even without the evidence, petitioner was able to impeach Flood. As discussed above, the trial court permitted the defense to impeach Flood at length on his identification of petitioner and on Flood's ability to view the crime. (Ex. 7 at 1057-70, 1088-89). Finally, the jury was instructed pursuant to CALCRIM No. 315 that in evaluating eyewitness identification testimony, it should consider various factors, including whether the witness knew the defendant before the event; how well he could see the perpetrator; the circumstances affecting the witness's ability to observe, including lighting, distance, and duration of the observation; how closely the witness was paying attention; whether the witness was under stress when he made the observation; how the witness's description compared with defendant; how much time had passed between the event and the identification; whether the witness was asked to pick the perpetrator out of a group; and how certain the witness was when he made the identification. (Ex. 1 at 499-500.) The impeachment evidence and jury instruction were sufficient to allow the jury to evaluate Flood's reliability as a witness. Therefore, the exclusion of the crime scene evidence did not affect petitioner's ability adequately to impeach Flood.

### ii. Confrontation

Petitioner's claim that the exclusion of crime scene evidence violated his right to confront witnesses against him fails for the same reason as his previous Confrontation Clause claim. Specifically, petitioner does not say that any witness against him was not present at trial and subject to cross-examination. Petitioner never proposed to use the video in Flood's cross-

United States District Court
Northern District of California

examination.  (See Ex. 7 at 1198-1203.)  Said evidence would have been introduced in the defense's case in chief through defense witness Donald Bailey.  (See id.)  As a Confrontation Clause claim, this claim is without merit.

Finally, as discussed above, the state's case consisted of strong evidence pointing to petitioner's guilt.  Petitioner thus fails to demonstrate he was prejudiced by the exclusion of the crime scene evidence.  See Hernandez, 282 F.3d at 1144; Brecht, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.    Exclusion of Evidence – Witness Bias

Petitioner claims that the trial court violated his right to present a defense and to confront witnesses when it prevented him from introducing evidence of Dwayne Johnson's bias.  (Petition at 8.)

a.    Background

The Court of Appeal considered and rejected this claim as follows:

After both sides had rested, a discussion took place outside the presence of the jury, in which defense counsel stated that he had earlier informed the court he wished to impeach Johnson with statements he had made to a defense investigator, which he had not raised during his cross-examination of Johnson.[15]  According to defense counsel, Johnson had told the investigator that he had spoken with the prosecutor about his pending case, and she had "patted the [petitioner]'s case file, which was lying on the table, and said, 'We're going to take care of you,' " and told him that the [petitioner]'s case was more important than his was, because it was a murder case, and that Johnson should not worry about the case pending against him.

[Petitioner] sought to introduce this evidence through the investigator.  The trial court denied the request on the ground that Johnson had been excused, and had not been asked to explain or deny the alleged statements on the stand.  [Petitioner] asked leave to recall Johnson to cross-examine him about the alleged statements.  The court denied the request to recall Johnson.  In doing so, it noted that the proposed evidence would prolong the trial and would not add anything substantial to the trial, as it was obvious that Johnson hoped for the favor of the district attorney in connection with the charges facing him.

_____

[15]

At the time this issue was placed on the record, both sides had rested.  However, it appears from the context that the discussion on the record reflected an earlier discussion that had taken place before the close of evidence.

22

[Petitioner] contends these rulings excluded persuasive evidence of Johnson's motivation for giving false testimony, thus depriving him of his constitutional rights to confront the witnesses against him, to present a defense, and to due process of law.

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Under Evidence Code section 770: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action." [16]

[Petitioner] contends the statements Johnson allegedly made to his investigator were inconsistent with his testimony at trial, and that they were admissible because Johnson had been so examined as to give him an opportunity to explain or deny the statements. (Evid.Code, § 770, subd. (a).) We reject this contention. The prosecutor asked Johnson at trial whether she had given him a deal on his robbery case, and whether she had told him that if he testified he would be "a free man," and Johnson testified that the prosecutor had not done so. He also testified that he was facing a possible sentence of 25 years to life and expected some consideration for his testimony. At no point was Johnson asked to explain or deny his statements to the investigator or to explain any discrepancy between those statements and his trial testimony. [Citation.]

Nor do we see any abuse of discretion in the trial court's decision not to recall Johnson to explain or deny the statements. [Citations.] Nothing had prevented [petitioner] from cross-examining Johnson about his statements during the prosecution's case. More importantly, the evidence had limited significance, as Johnson had come forward as a witness shortly after Bey was killed, and before he had committed the crimes with which he had been charged at the time of trial. Furthermore, it would have added little to what the jury already knew from Johnson's testimony: Johnson had testified that he was facing a possible sentence of 25 years to life, and that he expected to receive some consideration for his testimony.

Phillips, 2010 WL 1712905 at *11-12.

             b.     <u>Analysis</u>

                 i.  <u>Due Process</u>

The Court of Appeal's rejection of petitioner's due process claim was not unreasonable. Even without the evidence of Johnson's specific statements to the defense investigator, there was ample evidence of Johnson's motivations in testifying for the prosecution. On direct examination,

---

[16]

        Johnson had been excused.

23

Johnson testified that he was presently incarcerated at Santa Rita where he was facing charges on three robberies and Three Strikes allegations. (Ex. 7 at 730.) Johnson testified that he was expecting some kind of consideration for his testimony at petitioner's trial. (Id. at 733-34.)[17] Johnson also testified that he appeared as a prosecution witness in another murder trial four years earlier and received a $1,000 reward from "Crime Stoppers." (Id. at 734-35.) He considered himself an informant for the police department and had provided Officer Midyett with information in 10 to 15 cases. (Id. at 735-36.)

On cross-examination, Johnson admitted to being a career criminal who provided information to the police in order to get money. (Ex. 7 at 768.) He also testified that he would provide information to the police in order to get a better deal. (Id.) Part of Johnson's statement to the defense investigator was introduced on cross-examination. Specifically, Johnson had told the defense investigator that he "wouldn't come here unless the deal was signed, sealed, and delivered." (Id. at 770.) However, he testified that the prosecution was unwilling to give him any deal and that he ultimately came to testify "as a good citizen" after he "turned [his] life over to God." (Id. at 770-71.)

In sum, Johnson's motive to testify – i.e., to gain favor with the district attorney in the hopes of gaining a deal in his pending robbery case – was obvious and was before the jury. Additional evidence on Johnson's statements to the defense investigator would not have added much to petitioner's case. On this record, the Court finds the exclusion of the evidence did not deprive petitioner of the opportunity to present his defense.

ii. Confrontation

Petitioner's Confrontation Clause claim fails for substantially the same reasons. The trial court excluded only a small part of a statement that petitioner purportedly made to a defense investigator. However, Johnson was cross-examined on another part of that statement – most significantly his statement that he "wouldn't come here unless the deal was signed, sealed, and

---

[17] However, he also testified that he was not offered any deal on his robbery case in exchange for testifying, and he had spoken with the Oakland Police Department about petitioner's case before he was ever arrested on the robbery charges. (Id. at 733-34.)

delivered." (Ex. 7 at 770.) Additionally, both the prosecution and the defense adduced substantial additional evidence that demonstrated Johnson's potential bias. The excluded statement was repetitive of the other impeachment evidence. And the remaining impeachment evidence was sufficient to allow the jury to evaluate Johnson's biases and motivations. Further, it was reasonable for the trial court to exclude the evidence out of concern that permitting petitioner to reopen his case and recall Johnson would confuse the jury and consume an undue amount of time. See Van Arsdall, 475 U.S. at 679.

Finally, as discussed above, the state's case consisted of strong evidence pointing to petitioner's guilt. Petitioner thus fails to demonstrate he was prejudiced by the exclusion of the evidence of Johnson's bias. See Hernandez, 282 F.3d at 1144; Brecht, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

5.    Exclusion of Evidence – Police Officer Bias

Petitioner claims that the trial court violated his right to present a defense and to confront witnesses when it prevented him from introducing evidence of Detective Longmire's bias. (Petition at 8.)

a.    Background

The Court of Appeal considered and rejected this claim as follows:

After the parties had rested, but before the jury had been instructed and heard closing arguments, the San Francisco Chronicle published an article that explored the relationship between Longmire and Yusef Bey IV.[18] According to the article, Longmire and Bey IV had met shortly after Antar Bey was killed, and Longmire had intervened in a vandalism case in which Yusef Bey IV was a suspect.

On the next court date, [petitioner] asked to have the case reopened in order to cross-examine Nolan and Longmire, and possibly the lead investigator in the vandalism case, about the article. He argued that the information in the article was important because Longmire was only the secondary investigator in the Bey murder case and was not among the officers who went to the gas station immediately after the killing. He contended the information in the article should have been disclosed to him as exculpatory evidence because it bore upon Longmire's credibility, and that if it had been disclosed, he could have cross-examined Longmire about his relationship with Bey IV.

---

[18] Yusef Bey IV was the younger brother of Antar Bey. (Ex. 7 at 1423-24.)

United States District Court
Northern District of California

The trial court denied the request to reopen.  [Petitioner] contends that in doing so, the court abused its discretion and violated his rights to confrontation, to present a defense, and to due process of law, and that had the jury known of Longmire's relationship with Yusef Bey IV, it would have had a different view of his credibility.

We review a trial court's ruling on a request to reopen the case for abuse of discretion, taking into consideration (1) the stage of the proceedings, (2) the [petitioner]'s diligence in presenting the new evidence, (3) the prospect that the jury would accord the new evidence undue emphasis, and (4) the significance of the evidence.  (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

We see no abuse of discretion here.  Although the jury had not yet received its instructions and the request to reopen was made promptly after the Chronicle article appeared, the third and fourth factors weighed against reopening.  The jury might well accord undue emphasis to the evidence under the circumstances.  More importantly, whatever might have occurred in the vandalism investigation, nothing in the evidence suggested that Longmire improperly intervened in the Bey investigation.  Both Nolan and Longmire testified that they were partners in investigating homicides, and that in the Bey investigation, Nolan was the lead investigator.  Nolan testified that he met with Johnson when he came to the police station, and denied that either he or Longmire threatened Foy during their interview with her.  Moreover, Johnson approached Midyett first with information about the case.  There is no basis to conclude that Longmire improperly caused Johnson to implicate [petitioner] or that the information in the article was material exculpatory evidence.  In the circumstances, the trial court could properly conclude the evidence was not sufficiently relevant or probative to justify reopening the case.

Phillips, 2010 WL 1712905 at *13 (footnote omitted).

        b.     <u>Analysis</u>

           i.   <u>Due Process</u>

The Court of Appeal's rejection of petitioner's due process claim was not unreasonable.  The evidence was far from critical or trustworthy.  Longmire's role in investigating Bey's murder was minor.  He spoke with Johnson for only approximately 20 minutes.  (Ex. 7 at 298.)  His primary involvement was in interviewing Althea Foy, but Sergeant Nolan – the lead investigator – was present during that interview and conducted the interview with Longmire.  (Id. at 300-19, 1425.)  The purportedly new evidence was based on a newspaper article and on the assumption that the article was true and accurate.  (Id. at 1422-23, 1425.)  Finally, even assuming the truth of the article, the purported relationship between Longmire and Yusef Bey IV postdated the homicide investigation.  (Id.)  On this record, the Court finds the exclusion of the evidence did not deprive petitioner of the opportunity to present his defense.

United States District Court
Northern District of California

United States District Court
Northern District of California

ii.  Confrontation

Petitioner's Confrontation Clause claim fails for substantially the same reasons.  Defense counsel requested permission to reopen the case to be able to cross-examine Sergeant Nolan on these issues as well as Sergeant Longmire and the lead investigator in the liquor store vandalism case.  (Ex. 7 at 1421.)  But as noted by the Court of Appeal, and as discussed above, the information in the article did not contain material exculpatory evidence.  A reasonable jury would not have had a significantly different impression of the case if counsel had been allowed to reopen.  See Van Arsdall, 475 U.S. at 680.  Further, it was reasonable for the trial court to exclude the evidence out of concern that reopening the case would cause the jury to place undue emphasis on the evidence.  See Van Arsdall, 475 U.S. at 679.

Finally, as discussed above, the state's case consisted of strong evidence pointing to petitioner's guilt.  Petitioner thus fails to demonstrate he was prejudiced by the exclusion of the evidence of Longmire's purported bias.  See Hernandez, 282 F.3d at 1144; Brecht, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

6.  Prosecutorial Misconduct

Petitioner claims three instances of prosecutorial misconduct.  (Petition at 8.)  The Court of Appeal summarized this claim as follows:

> [Petitioner] contends the prosecutors, Dolge and McMahon, committed misconduct.  First, he argues Dolge committed misconduct when, without notice to [petitioner] or a prior lineup, he asked Flood at the preliminary hearing whether he recognized anyone in the courtroom.
>
> Second, he contends misconduct occurred when the prosecutors told the jury about the standard of proof during the preliminary hearing.  In her opening statement, McMahon explained to the jury that it would hear references to the preliminary hearing, and that "a preliminary hearing is a hearing where evidence is presented to a judge to make sure that there's enough evidence to continue prosecuting the [petitioner]."  Called as a witness at trial, Dolge testified about the circumstances under which Flood had identified [petitioner] at the preliminary hearing as the gunman he saw shoot Bey.  In the course of the examination, McMahon asked Dolge to describe to the jury what a preliminary hearing was, and he replied, "A preliminary hearing is a hearing in front of a judge, in which it's our job to present enough evidence to merit going forward with a trial.  The standard of proof is lower.  It is just for the judge to determine whether there's probable cause to hold the [petitioner] for trial, on the charges that we have filed."

Third, he argues that McMahon committed misconduct in closing argument by "unfairly exploiting" the trial court's ruling excluding evidence of third party culpability by arguing there was no evidence to support defense counsel's argument that the killing was not a "carjacking gone bad," but rather was committed by someone with inside information about Bey's activities; by making herself her own witness when she told the jury she had "time and time again" seen the defense tactic of coming up with a speculative theory of how the crime occurred; and by telling the jury it must not speculate.

Phillips, 2010 WL 1712905 at *14.

Respondent argues that this claim is procedurally defaulted and, even if it were addressed on its merits, it must be denied.

### a.      Procedural Default

The state appellate court determined that petitioner had waived all three claims:

[Petitioner] did not make a timely objection to any of the instances of alleged misconduct of which he now complains, and thereby waived his claims.  A timely objection at the preliminary hearing would have allowed the court to consider whether to allow Flood to answer when asked whether he recognized anyone in the courtroom.  Likewise, we see no reason that a timely objection and request for admonition would not have cured any harm from the other instances of alleged prosecutorial misconduct.

Phillips, 2010 WL 1712905 at *15.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.  See id. at 750. The rule cited here by the Court of Appeal, specifically, that a [petitioner] must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules).[19]

---

[19] Although a petitioner may avoid procedural default by showing cause for the default and actual prejudice as a result of the alleged violation of federal law, or by showing the failure to consider the claims will result in a fundamental miscarriage of justice, see Coleman 501 U.S. at 750, petitioner here has made no such showing or even an effort to do so.

1

        b.    <u>Merits Analysis</u>

2        Although the state appellate court found that the Confrontation Clause claim was

3 procedurally waived, it also found that the claim failed on the merits:

4        In any case, we would reject [petitioner]'s contentions on the merits.  We have already
         concluded that the trial court did not abuse its discretion in admitting evidence of Flood's
5        identification.  We have likewise concluded that the proffered evidence of third party
         culpability was properly excluded because it did not serve to link a third person to the
6        perpetration of the crime.  Thus, unlike the prosecutor in *People v. Daggett* (1990) 225
         Cal.App.3d 751, 757-758, upon which [petitioner] relies, the prosecutor here did not
7        comment unfairly on an erroneous ruling excluding the evidence.  [Citations.]  The
         prosecutor's remark that she had "time and time again" seen a [petitioner] present a
8        speculative theory was brief, and the jury was instructed that statements made by the
         attorneys were not evidence.  There is no basis to conclude that the comment, even if
9        improper, affected the verdict.  [Citation.]  As to comments about the standard of proof at
         the preliminary hearing, the jury was told that the standard there was lower than at trial.
10       Moreover, the comments did not amount to an argument that the fact [petitioner] had been
         held to answer was evidence of his guilt.  [Citation.]

11
         Nothing in the comments [petitioner] challenges constituted an egregious pattern of
12       conduct that made the trial unfair or involved the use of deceptive or reprehensible
         methods to persuade the court or the jury.  [Citation.]
13
<u>Phillips</u>, 2010 WL 1712905 at *15.
14
        Based on an independent review of the record, the Court cannot say the state court's
15
finding was objectively unreasonable.  Prosecutorial misconduct is cognizable in federal habeas
16
corpus; "the appropriate standard of review for such a claim . . . is the narrow one of due process,
17
and not the broad exercise of supervisory power."  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181
18
(1986) (internal quotation and citation omitted).  A [petitioner]'s due process rights are violated
19
when a prosecutor's misconduct renders a trial "fundamentally unfair."  <u>Id.</u>; <u>Smith v. Phillips</u>, 455
20
U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged
21
prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under
22
<u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next question
23
is whether such conduct "infected the trial with unfairness."  <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112
24
(9th Cir. 2005).  A prosecutorial misconduct claim is decided by "examining the entire
25
proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as
26
to make the resulting conviction a denial of due process."  <u>Johnson v. Sublett</u>, 63 F.3d 926, 929
27

28

1    (9th Cir. 1995) (internal quotation and citation omitted).

2          Where misconduct has occurred, the first factor in determining whether there has been a

3    due process violation is whether the trial court issued a curative instruction to the jury.  See e.g.,

4    U.S. v. de Cruz, 82 F.3d 856, 862 (9th Cir. 1996); U.S. v. Simtob, 901 F.2d 799, 806 (9th Cir.

5    1990); U.S. v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986).  When a curative instruction is issued,

6    a court presumes that the jury has disregarded the improper remarks and that no due process

7    violation occurred.  See Greer v. Miller, 483 U.S. 756, 766, n.8 (1987).

8          Other factors which a court may take into account in determining whether misconduct rises

9    to a due process violation are: (1) the weight of evidence of guilt, United States v. Young, 470

10   U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, see

11   Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir.1987) ("courts will not reverse when the prosecutorial

12   comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis

13   of conviction, and is followed by curative instructions"); and (3) whether the misconduct relates to

14   a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose

15   information showing potential bias of witness especially significant because government's case

16   rested on credibility of that witness).

17         Regarding Flood's identification of petitioner at the preliminary hearing, as discussed

18   above, even assuming the conditions of the identification were unduly suggestive, the

19   identification did not infect the trial with such unfairness that the resulting conviction was a denial

20   of due process.  There were many indicia of the reliability of Flood's identification of petitioner,

21   and the weaknesses of the identification were brought out on petitioner's cross-examination of

22   Flood and were argued extensively in petitioner's closing argument.  And as noted above, the court

23   instructed the jury, pursuant to CALCRIM No. 315, on how to evaluate eyewitness identification

24   testimony.  (Ex. 1 at 499-500.)

25         Regarding the prosecutor's comments about the standard of proof at the preliminary

26   examination, the comments merely let the jury know about the purpose of the preliminary hearing.

27   This was necessary because there was testimony concerning evidence taken from the preliminary

28   hearing.  Specifically, Greg Dolge – the deputy district attorney who prosecuted the case at the

United States District Court
Northern District of California

30

1  preliminary hearing – was called as a witness at trial to testify to the events leading up to Flood's

2  identification of petitioner at the preliminary hearing. (Ex. 7 at 1096-98.) The prosecution

3  carefully explained that the standard of proof is lower at the preliminary hearing than at trial. (Id.

4  at 1092-93.) This was a correct statement of law and did not impart to the jury the impression that

5  a prior trier of fact had already decided petitioner's guilt.

6        Finally, regarding petitioner's claim that the prosecutor made improper statements in

7  closing argument, the prosecutor was merely commenting on the lack of evidence to support

8  petitioner's defense of third party culpability. In its closing argument, the defense asserted that the

9  crime was not an attempted carjacking but an intentional killing aimed specifically at Antar Bey

10  by someone with inside information about where Bey would be. (Ex. 7 at 1530-32.) In her

11  rebuttal, the prosecutor argued that petitioner's claim – that the killing was an intentional

12  assassination – was based on speculation:

> [A]t the end of [defense counsel's] closing argument, he gave you an explanation for why Antar Bey was murdered. An explanation that is really not accurate. What it was was a fun little conspiracy theory that was completely unsupported by any of the facts that you heard in this trial. There was not a shred of evidence to support anything that [defense counsel] told you during the last 15 minutes of his closing argument, not a shred of evidence. He was asking you to speculate. And you cannot, and you must not do that.
> …
> And why did he do that? Why did he want to mislead you? Because he couldn't stand up in his closing argument and say, "You know what? [The prosecutor] proved her case beyond a reasonable doubt. There is a mountain of evidence piled up high on top of my client." Because there is, but he can't stand up there and tell you that. He doesn't have a defense. And while I've seen it time and time again, and that's what happens when you don't have a defense, you pick apart the prosecution witnesses, and then you come up with some speculative idea as to why all this happened.

21  (Ex. 7 at 1539.)

22        As previously discussed, the trial court properly excluded statements on third party

23  culpability on the ground that there was no evidence linking a third party to the perpetration of

24  Bey's murder. While a prosecutor engages in misconduct if he calls the defense a sham, see

25  United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999), when read in context, the

26  prosecutor here was properly arguing that there was no evidence to support petitioner's theory.

27  See Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998) ("[P]rosecutorial comment must be

28

United States District Court
Northern District of California

1   examined in context.") (citation omitted).  To urge the jury not to accept the defense's explanation

2   for the crime is an important purpose of attorney argument.

3       Finally, even assuming the comment was inappropriate, the comment did not "so infect[]

4   the trial with unfairness" as to make the conviction a denial of due process.  See Johnson, 63 F.3d

5   at 929.  Rather, it was a brief, isolated remark that had been preceded by the prosecutor's lengthy

6   and otherwise proper closing argument and an equally lengthy closing argument by the defense.

7   (See Ex. 7 at 1449-1534.)  Further, the jury was instructed that the arguments of the attorneys

8   were not evidence.  (Ex. 1 at 491.)  See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)

9   (rejecting prosecutorial misconduct claim in part because court had instructed jury that attorneys'

10  statements are not evidence).  Finally, as discussed above, the evidence of petitioner's guilt was

11  strong.

12      Accordingly, petitioner is not entitled to habeas relief on this claim.

13      7.   Cumulative Error

14  Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted

15  errors.  (Petition at 8.)  For the reasons discussed above, the Court has found no constitutional

16  error exists, let alone multiple errors.  As there have been no errors to accumulate, there can be no

17  due process violation based on a theory of "cumulative" error.  See Mancuso v. Olivarez, 292 F.3d

18  939, 957 (9th Cir. 2002) (holding where there are no errors, there can be no cumulative error).

19      Accordingly, petitioner is not entitled to habeas relief on this claim.

20  C.   Certificate of Appealability

21  The federal rules governing habeas cases brought by state prisoners require a district court

22  that issues an order denying a habeas petition to either grant or deny therein a certificate of

23  appealability.  See Rules Governing § 2254 Case, Rule 11(a).

24  A judge shall grant a certificate of appealability "only if the applicant has made a

25  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

26  certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

27  court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

28  is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

United States District Court
Northern District of California

32

court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

The Clerk is further directed to: (1) substitute P.D. Brazelton on the docket as the respondent in this action; (2) correct the spelling of petitioner's name on the docket by substituting Alfonza for Alfonzo; and (3) change petitioner's address to Alfonza A. Phillips, #G-00520, Pleasant Valley State Prison, P.O. Box 8500, Coalinga, CA 93210.

**IT IS SO ORDERED.**

Dated:  November 13, 2013

_____
JON S. TIGAR
United States District Judge